# CITY OF WORCESTER & another[1] *vs.* LABOR RELATIONS COMMISSION.

No. 99-P-1443.

Suffolk. May 17, 2001. - October 29, 2001.

Present: RAPOZA, DREBEN, & McHUGH, JJ.

Further appellate review granted, 435 Mass. 1107 (2002).

*Labor Relations Commission. Labor,* Public employment, Collective bargaining, Duty to bargain. *Contract,* Collective bargaining contract. *Police,* Collective bargaining, Assignment of duties. *Public Employment,* Collective bargaining.

Discussion of G. L. c. 150E, § 6, and the scope of mandatory bargaining under Massachusetts public sector labor relations law. [111-113]

The city of Worcester, by designating all police officers as "supervisors of school attendance" and promulgating an implementing order, sought to require police officers to perform a function for which police officers had not traditionally been responsible, which had no demonstrated relationship to public safety, and which the Legislature had, by statute, committed to an entirely different group of public employees; consequently, the designation and the order did not deal with "core managerial prerogatives" regarding deployment of police in the city of Worcester, and the designation and the order, as well as their impacts, were, under G. L. c. 150E, § 6, mandatory subjects for collective bargaining. [113-115]

APPEAL from a decision of the Labor Relations Commission.

*Richard K. Sullivan* for International Brotherhood of Police Officers, Local 378.

*Steven Mourginis,* Assistant City Solicitor, for city of Worcester.

*John B. Cochran* for the defendant.

McHUGH, J. Apparently concerned about youngsters absenting themselves from school, the Worcester city manager designated all officers of the Worcester police department as "supervisors of [school] attendance." Shortly thereafter, the Worcester police

---

[1]International Brotherhood of Police Officers, Local 378.

chief promulgated a special order setting out certain procedures the officers were to follow in carrying out their supervisory responsibilities.

After the chief promulgated his implementing order, the International Brotherhood of Police Officers, Local 378 (union), which represents the officers below the rank of sergeant, filed with the Labor Relations Commission (commission) an unfair labor practice charge against the city of Worcester (city). In its charge, the union claimed that the city had made the designation and had issued the order without notice even though both were mandatory subjects of bargaining under G. L. c. 150E, § 6. By doing so, the union claimed, the city had violated G. L. c. 150E, § 10(a)(5), inserted by St. 1973, c. 1078, § 2, which makes it a prohibited practice to "[r]efuse to bargain collectively in good faith," and, derivatively, G. L. c. 150E, § 10(a)(1), which makes it an unfair labor practice to "[i]nterfere, restrain, or coerce any employee in the exercise of any right guaranteed" by c. 150E as a whole. The city responded by claiming that it had no obligation to bargain over the designation, the implementing order or the impact that either would have on the officers who were part of the bargaining unit.

After hearing, the commission concluded that the city was not required to bargain over the designation or terms of the implementing order, but was required to bargain over the impact both would have on the officers. The union and the city then appealed to this court from the portions of the commission's order adverse to them. We conclude that the city was required to bargain over the designation, the implementing order, and their impacts, and we therefore reverse.

The essential facts are not in serious dispute. Indeed, the union and the city presented their respective positions to the commission on an agreed statement of facts coupled with the brief testimony of Officer James Collins, the union's president. That agreed statement and supplemental testimony revealed that the chief issued the order now at issue on September 16, 1996, in the midst of negotiations between the union and the city for what became a collective bargaining agreement covering the period July 1, 1996, through June 30, 1997.

The chief's order was entitled "Truancy Intervention" and

stated that, on August 26, 1996, the city manager had designated all Worcester police officers as "supervisors of attendance with the authority to exercise the duties specified in [G. L. c. 76, §§ 19 and 20,] which include the power to apprehend and take to school without a warrant any truant or absentee found wandering in the streets or public places."

Following that recitation, the order stated, in essence, that officers who, during the school hours, "encounter[ed]" youngsters who appeared to be under sixteen were required to determine whether they were enrolled in schools and, if so, whether they were absent without authority. If the youngster was enrolled and was absent without authority, then the officer was to "offer [him or her] transportation" to the appropriate "[s]tudent [a]ttendance [c]enter"[2] in downtown Worcester. If the youngster declined the offer, the officer was to discontinue his or her contact with the student. If the youngster accepted the offer, the officer was to transport the student to the attendance center. The commission concluded that each encounter of the type just described was likely to take between forty-five and ninety minutes from inception to completion. Moreover, if the youngster accepted the transportation offer, the officer would be required to leave his or her patrol sector to deliver the student to the attendance center and other police officers would be required to cover the abandoned sector, as well as their own, during the transporting officer's absence.

Before the city manager's designation and the chief's order, Worcester police officers possessed, and exercised, discretionary power to determine whether youngsters they encountered in the course of responding to calls for suspected criminal behavior or public disturbances were absent from school without permission. If so, the officers had, and had exercised, the power to transport the youngsters to the schools they should have been attending. The officers had exercised that power, however, only as an adjunct to their traditional role of investigating, suppressing and quelling crimes and public disturbances. They were not required

---

[2]Although the record is unclear on the point, a student attendance center appears to be a facility in which, among other things, students impermissibly out of school are processed and perhaps directed to the schools they should be attending.

to, and did not, make pure "truancy" inquiries, i.e., inquiries of youngsters whom the officers encountered in non-criminal contexts simply to determine whether the youngsters belonged in school.

General Laws c. 76, §§ 19 and 20, the statutory provisions cited in the chief's order, are part of a chapter of the General Laws dealing with school attendance and related matters. General Laws c. 76, § 1, in essence and with a series of exceptions here irrelevant, requires school attendance by all children under sixteen years of age. To enforce that requirement, §§ 19 and 20 deal with the position of "supervisor of attendance." Descended from a statute first enacted in 1873 (see St. 1873 c. 262, § 2), section 19 provides that "[e]very school committee shall appoint, make regulations governing and fix the compensation of one or more supervisors of attendance."[3] G. L. c. 76, § 19, inserted by St. 1973, c. 1073, § 1. Section 20 imposes on "supervisors of attendance" a series of duties and powers, one of which is that they "may apprehend and take to school without a warrant any truant or absentee found wandering in the streets or public places."[4] G. L. c. 76, § 20, inserted by St. 1973, c. 1073, § 1.

Well before this controversy arose, the Worcester school committee, acting pursuant to § 19, had appointed "supervisors

[3]The union does not here contest the city manager's power to appoint attendance supervisors. For present purposes, it implicitly concedes that power and contests only the way in which the manager, aided by the chief, exercised that power in this case.

[4]In addition, § 20 requires supervisors of attendance to "inquire into all cases arising under" G. L. c. 72, §§ 2, 8 (dealing with school eligibility and attendance records); G. L. c. 76, §§ 1, 2, 4-11, 15 (dealing with school attendance, notification of absences and payment for the schooling of certain students); G. L. c. 149, §§ 90, 92, 93, 95 (dealing with employment of children under sixteen). Section 20 also gives supervisors of attendance discretionary power to file petitions under G. L. c. 119, § 39E (dealing with children in need of services). Beyond that, § 20 provides that supervisors of attendance "shall, if the court so orders, have oversight of children placed on probation; of minors licensed by the school committee under [G. L. c. 101, § 19 (dealing with 'bootblacking')]; and of children admitted to or attending shows or entertainments in violation of [G. L. c. 140, § 197 (dealing with unaccompanied attendance by minors at 'shows or entertainments' after 6:00 P.M. or during school hours)]." Finally, G. L. c. 72, § 2, reposes in supervisors of attendance responsibility for maintenance and accuracy of school eligibility and attendance records.

of attendance." At the time of the chief's order, those supervisors were covered by a collective bargaining agreement between the Worcester school committee and the Educational Association of Worcester.[5]

Against that factual and statutory backdrop, the commission reached two related conclusions. First, the commission concluded that "[d]ecisions concerning where to deploy public services are managerial prerogatives that are not subject to bargaining. . . . [D]esignating officers as supervisors of attendance with truancy intervention responsibilities [is a decision] that fall[s] within the penumbra of managerial rights and [is] not subject to mandatory bargaining." Nevertheless, the commission, relying on the decision in *School Comm. of Newton* v. *Labor Relations Commn.*, 388 Mass. 557 (1983), concluded that the city's decision had an impact on the affected police officers' workloads and that the city consequently had an obligation to bargain with the union over the impact of the city manager's designation and the police chief's order. Pending completion of that "impact" bargaining, the commission ordered the city to cease its enforcement of the chief's September 16 order and to restore the status that had existed before the order was promulgated.[6]

In reviewing the commission's decision, we "give due weight

---

[5]Indeed, a subtext in the union's appeal is a claim that the city manager's designation and the chief's implementing order amounted to a transfer of work out of the bargaining unit comprised of supervisors and into the bargaining unit comprised of police officers without the bargaining customarily required when such transfers are contemplated. See *City of New Bedford*, 15 M.L.C. 1732, 1736 (1989) ("The Commission has held consistently that an employer must bargain with its employees before transferring work that traditionally has been performed by bargaining unit employees to non-unit personnel"). The Educational Association of Worcester, however, is not a party to the present appeal and was not a party to the proceedings before the commission. The union has cited no case for the proposition that the transferee of work formerly performed by another bargaining unit has the right to assert an unfair labor practice claim on behalf of the transferor unit. Consequently, we disregard the arguments the union seeks to raise on the Educational Association's behalf.

[6]The commission declined, however, to order additional compensation for the officers for each day on which they had served as "supervisors of attendance," finding that they had incurred no economic loss as a consequence of their service. The union has not appealed from that portion of the commission's order.

to the [commission's] experience, technical competence, and specialized knowledge . . . as well as to the discretionary authority conferred upon it." G. L. c. 30A, § 14. *Commonwealth* v. *Labor Relations Commn.*, 404 Mass. 124, 127 (1989). Moreover, we cannot substitute our judgment for that of the commission, even "on the basis of evidence in the record that might have warranted a contrary conclusion." *School Comm. of Newton* v. *Labor Relations Commn.*, 388 Mass. at 573. "These principles of deference, however, are not principles of abdication." *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgmt. Bd.*, 421 Mass. 196, 211 (1995). Decisions based on errors of law, *Goncalves* v. *Labor Relations Commn.*, 43 Mass. App. Ct. 289, 297 (1997), or decisions unsupported by substantial evidence, when all evidence in the record is fairly considered, *id.* at 295, citing *Pyfrom* v. *Commissioner of Pub. Welfare*, 39 Mass. App. Ct. 621, 624-625 (1996), cannot stand.

With those principles in mind, we begin our analysis of the commission's order by considering the terms of G. L. c. 150E, § 6, a statute broadly requiring public employers and employees to "negotiate in good faith with respect to wages, hours, standards of productivity and performance, and any other terms and conditions of employment." Despite the statute's facial breadth, decided cases have created an area within which the public employer is able to make decisions about the nature, quality and quantity of work assignments without prior bargaining. Those decisions have spawned numerous questions about where the employer's freedom to act ends and its obligation to bargain begins. Those questions, in turn, have bedeviled courts and commentators for decades. Indeed, both this court and the Supreme Judicial Court have stated, implicitly and explicitly, that "[a]ny attempt to define with precision and certainty the subjects about which bargaining is mandated by [c.] 150E is doomed to failure." *Lynn* v. *Labor Relations Commn.*, 43 Mass. App. Ct. 172, 177 (1997), quoting from Greenbaum, The Scope of Mandatory Bargaining Under Massachusetts Public Sector Labor Relations Law, 72 Mass. L. Rev. 102 (1987). Consequently, in locating the line dividing mandatory subjects of bargaining from managerial decisions reserved to the public employer's discretion, one almost inevitably

proceeds on a case-by-case basis. See *Burlington* v. *Labor Relations Commn.*, 390 Mass. 157, 164 (1983).

To reduce some of the imprecision inherent in the task of case-by-case definition, this court in *Lynn* v. *Labor Relations Commn.*, *supra*, described several tools that have emerged for use in at least approximating the dividing line's location. All are designed to "defin[e] the boundary between subjects that by statute, by tradition, or by common sense must be reserved to the sole discretion of the public employer so as to preserve the intended role of the governmental agency and its accountability in the political process." *Id.* at 178.

One such tool focuses on "whether the ingredient of public policy in the issue subject to dispute is so comparatively heavy that collective bargaining, and even voluntary arbitration, on the subject is, as a matter of law, to be denied effect." *Ibid.*, quoting from *School Comm. of Boston* v. *Boston Teachers Union, Local 66*, 378 Mass. 65, 71 (1979). Use of that tool often results in a conclusion that decisions regarding "deployment, uniforms, and weapons of police officers" are exempt from mandatory bargaining. *Lynn* v. *Labor Relations Commn.*, *supra* at 179 & n.10. See *Local 346, Intl. Bhd. of Police Officers* v. *Labor Relations Commn.*, 391 Mass. 429, 439-440 (1984) (requirement to take lie-detector tests); *Boston* v. *Boston Police Patrolmen's Assn.*, 403 Mass. 680, 684-685 (1989) (number of officers assigned to patrol cars); *Boston* v. *Boston Police Patrolmen's Assn.*, 8 Mass. App. Ct. 220, 225-227, (1979) (reissuance of officer's service revolver); *Boston* v. *Boston Police Superior Officers Fedn.*, 9 Mass. App. Ct. 898 (1980) (assignment of officer to temporary duty); *Taunton* v. *Taunton Branch of the Mass. Police Assn.*, 10 Mass. App. Ct. 237, 241-245 (1980) (shift assignments); *Boston* v. *Boston Police Patrolmen's Assn.*, 41 Mass. App. Ct. 269, 272 (1996) (overtime assignments).

The commission, now and historically, often has used the phrase "core managerial prerogative" as a label for essentially the same classifying tool. The label was quoted with apparent approval in *Local 346, Intl. Bhd. of Police Officers* v. *Labor Relations Commn.*, 391 Mass. at 437-438, and the commission applies it to decisions so central to proper execution of the public employer's business that those decisions are immune

from the otherwise broad bargaining requirement G. L. c. 150E, § 6, contains. See, e.g., *City of Boston*, 21 M.L.C. 1350, 1360 (1994); *Higher Educ. Coordinating Council*, 23 M.L.C. 16, 19 (1996); *City of Cambridge*, 23 M.L.C. 28, 36 (1996). While the commission's label, like many, is much more a conclusion than an analytical tool, it too is useful shorthand for decisions that are immunized from mandatory bargaining requirements when the nexus between the decision and the employer's ability to discharge its public function is carefully examined.

Here, both the city and the commission assert that the city manager's designation and the chief's implementing order deal with core managerial prerogatives regarding deployment of police in the city of Worcester. Indeed, in its decision, the commission appears to have taken the position that no management decision regarding where to "deploy public services" is subject to bargaining. Less globally, both the city and the commission urge here that whether and how to deal with an issue of public concern like truancy is a decision so heavily laden with issues of sound public policy that the decision simply cannot be encumbered by bargaining obligations.[7] For two reasons, however, that assertion is unpersuasive.

First of all, even a quick review of duties legislatively assigned to "supervisors of attendance," see note 4, *supra*, shows how substantially those duties differ from those traditionally performed by police officers. That difference undoubtedly accounts for the Legislature's considered judgment, basically unchanged for more than 125 years, that the local school committee, not the city manager or the police chief, should appoint "supervisors of attendance" and see to their training and deployment.

Secondly, while there can be no doubt that all institutions, public and private alike, have some responsibility for ensuring that the young are adequately educated, the record in this case is completely devoid of any suggestion whatsoever that public safety was implicated by whatever truancy problems afflicted Worcester. Indeed, on the face of it, nothing in the record — apart perhaps from a history generated by their accidental

---

[7]The city and commission, of course, part company over the city's obligation to bargain with respect to the decision's impact.

encounters with truants while performing other functions — suggests that police officers by nature, training, disposition or outlook, are or would be any better or any worse at supervising school attendance than, say, firefighters or employees of the recreation department.

Perhaps anticipating the difficulty with its "core management" approach, the city, relying on *Town of Scituate*, 15 M.L.C. 1009 (1988), argues that the police officers' historic discretionary performance of truancy functions amounts to a past practice that enabled the city to impose mandatory requirements without bargaining. In *Town of Scituate*, the town had called on firefighters to perform voluntary dispatching duties when the town did not have enough regular dispatchers available to do the job. Subsequently abandoning the voluntary component of the arrangement, the town ordered firefighters to perform those duties. The examiner who heard the ensuing dispute ruled that, because of the past voluntary practice, the town was not required to bargain over its mandatory order.

The city seeks to have *Town of Scituate*, a hearing examiner's decision never adopted by the full commission, carry far too much water. Whatever effect past practice had in that case, past practice provides no uniform and facile exit from the analysis decided cases otherwise require. More importantly, the order in this case did not simply require the officers to do what they previously had done voluntarily. Instead, by designating police officers as "supervisors of attendance," the city created for them a set of statutorily defined responsibilities and duties they had not previously carried out, voluntarily, through exercise of discretion or otherwise.[8]

In the last analysis, the police department's core functions are those having at least some perceptible relation to public safety, prevention of public disturbances, apprehension of lawbreakers and assisting those in manifest peril. See generally G. L. c. 41,

---

[8]Indeed, even the officers' "truancy" duties were materially different. No longer were they to balance the desirability of driving volunteers to their appropriate attendance center against the other needs of an effective patrol. School transportation for those who sought it became a responsibility co-equal to the myriad others with which they were charged. Standing alone, the "truancy" change would not be dispositive but, as this opinion illustrates, the "truancy" change does not stand alone.

§ 98 (describing the powers and duties of police officers). As long as managerial decisions aim to deploy officers to deal with those functions or to deliver the levels of service necessary for effective execution of those functions, management has a relatively free hand. When, however, the city seeks, as it has in this case, to require police officers to perform a function for which police officers have not traditionally been responsible, which has no demonstrated relationship to public safety, and which the Legislature has by statute committed to an entirely different group of public employees, the function is not a "core managerial" function and G. L. c. 150E, § 6, requires the city to bargain not only over the requirement's impact but also over the requirement itself. The decision and order of the Labor Relations Commission are reversed, and the commission shall enter a new order consistent with this opinion.

*So ordered.*