CITY OF WORCESTER & another[1] *vs.* LABOR RELATIONS
COMMISSION.

Suffolk. September 5, 2002. - November 27, 2002.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Labor Relations Commission. Administrative Law,* Agency, Judicial review,
Agency's interpretation of statute. *Labor,* Public employment, Collective
bargaining, Duty to bargain. *Contract,* Collective bargaining contract.
*Police,* Collective bargaining, Assignment of duties. *Public Employment,*
Managerial prerogative, Collective bargaining, Police. *Municipal Corpora-
tions,* Police, Collective bargaining.

This court concluded that a city had the management prerogative, as a matter
of policy, to designate all police officers as "supervisors of school at-
tendance," and that the city was not required by G. L. c. 150E, § 6, to
bargain with a police union over the city's decision to assign truancy
enforcement duties, previously committed to an entirely different group of
public employees, to its police officers. [180-185]

APPEAL from a decision of the Labor Relations Commission.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Keith Alan Hood* for city of Worcester.

*Marjorie F. Wittner* for the defendant.

*Richard K. Sullivan* for International Brotherhood of Police
Officers, Local 378.

SOSMAN, J. The Labor Relations Commission (commission)
determined that the city of Worcester had engaged in a
prohibited labor practice when it failed to bargain about the
impacts of its order requiring that police officers take certain
measures to combat school truancy. Both the city and the
International Brotherhood of Police Officers, Local 378 (union)
appealed from that determination. The Appeals Court held that
the commission's decision and order were insufficient, in that

---

[1] International Brotherhood of Police Officers, Local 378.

they required the city to bargain only over the impacts of the decision, whereas the city also had a duty to bargain over the decision itself. *Worcester* v. *Labor Relations Comm'n*, 53 Mass. App. Ct. 106 (2001). We granted the city's application for further appellate review. For the following reasons, we hold that the city is not required to bargain over the decision to assign truancy enforcement duties to its police officers, and we affirm the commission's order.

1. *Facts and commission proceedings.* The commission found the following facts. The union is the exclusive bargaining representative of a unit consisting of all full-time officers below the rank of sergeant employed by the city's police department. The union and the city were parties to a collective bargaining agreement at all relevant times. On September 16, 1996, the chief of police advised all commanding officers of a special order to be implemented immediately. The union was not given notice and an opportunity to bargain concerning that special order, its impact, or its implementation.

The special order recited that, on August 26, 1996, the city manager had designated all police officers as "supervisors of attendance with the authority to exercise the duties specified in G. L. c. 76, §§ 19 and 20, which include the power to apprehend and take to school without a warrant any truant or absentee found wandering in the streets or public places." The special order proceeded to announce certain mandatory procedures for officer interactions with truants. Whenever an officer encountered a student outside school premises during school hours, the officer was to inquire whether the student was in fact truant, obtaining the student's name and school. The officer was then to contact the dispatcher, who would in turn contact the school to ascertain the student's status.[2] If the school confirmed the truancy, the officer was to offer the student transportation to a student attendance center (or, in the case of a vocational school student, to a specified administrative office). If the student accepted the offer of transportation, the student was to be transported by cruiser (not patrol wagon) and without restraints. A patfrisk was to be performed if there was reason-

[2]The dispatcher was also required to perform a record check on any suspected truant.

able suspicion that the student was armed, and items in the student's possession were to be kept on the front passenger seat. After transporting the student, the officer was to file an incident report, including the student's name, address, age, and date of birth; location of the contact; and the name of the person to whom the student was delivered.

These procedures applied only to those students who voluntarily accepted the offer of transportation. If the student declined the offer, or otherwise resisted or fled, the officer was to discontinue the contact, unless the officer had some lawful basis for an arrest or reasonable suspicion that the student was committing or was about to commit an unlawful act.[3] If the officer broke off the encounter with a truant student, the officer was to supply the center or administrative office with the student's name and a report of the circumstances surrounding the contact.

Prior to the issuance of this special order, officers had discretion to investigate whether youths they encountered were truant from school. If the officer chose to investigate, the normal practice was to identify the potential truant, confirm the youth's status through the dispatcher's contact with the school, and, if the truant agreed, to transport the truant to the school. Thus, while the steps were similar (the only difference being that formerly a truant student was transported to school whereas under the special order such students would be transported to a center or administrative office), the officer's discretion to investigate a suspected truancy was transformed into a requirement to investigate all cases of suspected truancy.

The contacts with truants required by the special order could last from forty-five minutes to one and one-half hours, and the process of transporting a truant might require an officer to leave that officer's normal patrol route. In such instances, there would be no coverage on the patrol route, as only one patrol car was ordinarily assigned to a patrol route.

The union filed a complaint alleging that the city had engaged in a prohibited practice by requiring the officers to perform these truancy investigation and transportation duties without giving the union notice and an opportunity to bargain. See G. L.

---

[3]If there was an outstanding warrant or any other basis for arrest, normal procedures for the handling of juveniles were to be followed.

c. 150E, § 10 (*a*) (5). Based on the above facts, the commission determined that the decision to require police investigation of suspected truants was a core managerial decision concerning where to deploy public services. That decision was not subject to mandatory bargaining under G. L. c. 150E, § 6, and therefore, the city's failure to bargain over that decision was not a violation of G. L. c. 150E, § 10 (*a*) (5). However, the commission held that there remained an obligation to bargain over the impact of such management decisions, and the special order had an impact on the "workload" of officers when it required them to take measures that had previously been left up to an officer's discretion. Thus, the city had violated G. L. c. 150E, § 10 (*a*) (5), and, derivatively, § 10 (*a*) (1), when it issued the special order without giving the union notice and an opportunity to bargain concerning the impact of the decision to require officers to investigate suspected truancies.

2. *Discussion.* Judicial review of commission decisions is to be conducted in accordance with G. L. c. 30A, § 14. G. L. c. 150E, § 11. We therefore must accord deference to the commission's specialized knowledge and expertise, and to its interpretation of the applicable statutory provisions. See *MCI Telecommunications Corp.* v. *Department of Telecommunications & Energy,* 435 Mass. 144, 150-151 (2001), and cases cited.

Pursuant to G. L. c. 150E, § 6, public employers must "negotiate in good faith with respect to wages, hours, standards or productivity and performance, and any other terms and conditions of employment." However, from that expansively defined category of mandatory bargaining subjects, we have exempted certain types of managerial decisions that must, as a matter of policy, be reserved to the public employer's discretion. "[I]n instances where a negotiation requirement would unduly impinge on a public employer's freedom to perform its public functions, G. L. c. 150E, § 6, does not mandate bargaining over a decision directly affecting the employment relationship." *Local 346, Int'l Bhd. of Police Officers* v. *Labor Relations Comm'n,* 391 Mass. 429, 437 (1984). See *Boston* v. *Boston Police Pat`men's Ass'n,* 403 Mass. 680, 684 (1989); *Burlington* v. *Lab ` Relations Comm'n,* 390 Mass. 157, 164 (1983); *Lynn* v.

*Labor Relations Comm'n*, 43 Mass. App. Ct. 172, 178-179 (1997). "[T]he inquiry has been directed towards defining the boundary between subjects that by statute, by tradition, or by common sense must be reserved to the sole discretion of the public employer so as to preserve the intended role of the governmental agency and its accountability in the political process." *Id.* at 178. "[T]he crucial factor in determining whether a given issue is a mandatory subject of bargaining is whether resolution of the issue at the bargaining table is deemed to conflict with perceived requirements of public policy." Greenbaum, The Scope of Mandatory Bargaining Under Massachusetts Public Sector Labor Relations Law, 72 Mass. L. Rev. 102, 103 (1987).

Thus, for example, a school committee may decide to reduce its level of custodial staffing, *School Comm. of Newton* v. *Labor Relations Comm'n*, 388 Mass. 557, 561-562 (1983), or a police commissioner may decide that only one officer, not two, is to be assigned to each marked cruiser, *Boston* v. *Boston Police Patrolmen's Ass'n, supra* at 684, or a police chief may require officers suspected of criminal conduct to take a polygraph examination, *Local 346, Int'l Bhd. of Police Officers* v. *Labor Relations Comm'n, supra* at 439-440, without bargaining over such decisions. "The list of factors so fundamental to the effective operation of an enterprise as to be exempt from mandatory bargaining requirements will of necessity vary with the nature of the employer," *id.* at 438, and the inquiry as to whether a particular decision falls within that sphere of core managerial prerogatives must therefore be made on a case-by-case basis, *Burlington* v. *Labor Relations Comm'n, supra* at 164.

The present case implicates the city's ability to set its law enforcement priorities. Children between certain ages are required to attend school, and parents may be prosecuted and fined for failing to cause their child to attend school. G. L. c. 76, §§ 1, 2. See *Commonwealth* v. *Renfrew*, 332 Mass. 492 (1955). See also G. L. c. 76, § 4 (crime of inducing or attempting to induce minor to absent himself from school, or employing or harboring minor who is unlawfully absent from school). That other mechanisms for addressing truancy may also exist, see, e.g., G. L. c. 76, §§ 19, 20 (school committees shall ap-

point "supervisors of attendance" who shall "inquire into" truancy cases), does not eliminate truancy as a valid subject of attention by traditional law enforcement agencies. Nor does past practice relegating a certain problem to other forms of intervention deprive a municipality of its prerogative to change its practice and make that problem a priority of law enforcement. For example, while it may in the past have been common practice for police officers to ignore cases of domestic violence, preferring to treat the subject as a private dispute to be resolved by social service agencies, municipal authorities retained the discretion to adopt a policy of active police intervention in domestic violence cases.

Setting the priorities for the deployment of law enforcement resources is purely a matter of policy. See *Burlington* v. *Labor Relations Comm'n, supra* at 164 (decision to assign prosecutorial duties to town counsel instead of to police prosecutors "is an exclusive managerial prerogative, and not a proper subject for collective bargaining"). A city should not have to bargain over which types of infractions merit more attention from law enforcement than others. If the city of Worcester has decided that aggressive enforcement of the law mandating school attendance will reduce juvenile crime, or deter the formation of youth gangs, or otherwise contribute to the safety and well-being of the city, that is a policy decision for the city to make. The allocation of resources among competing law enforcement priorities "must be reserved to the sole discretion of the public employer so as to preserve the intended role of the governmental agency and its accountability in the political process." *Lynn* v. *Labor Relations Comm'n, supra* at 178. Those priorities are not a proper subject of bargaining.

The Appeals Court was apparently of the view that the city needed to support its truancy enforcement policy with evidence before it could claim the policy as a management prerogative. *Worcester* v. *Labor Relations Comm'n,* 53 Mass. App. Ct. 106, 113-114 (2001) (recognizing that all public institutions "have some responsibility for ensuring that the young are adequately educated," but declining to treat decision as core managerial prerogative where "the record in this case is completely devoid of any suggestion whatsoever that public safety was implicated

by whatever truancy problems afflicted Worcester" or "that police officers by nature, training, disposition or outlook, are or would be any better or any worse at supervising school attendance than, say, firefighters or employees of the recreation department"). A public employer need not defend the wisdom of a policy choice that it has made in order to have that choice recognized as a core managerial prerogative. It is the fact that the public employer's choice is one of policy, not the merits of the choice the employer makes, that renders the choice an inappropriate subject of mandatory bargaining. As such, the city did not have to present evidence explaining or justifying its decision to engage police officers in enforcing laws pertaining to school attendance, and its failure to produce such evidence has no bearing on whether the adoption of the special order was a subject of mandatory bargaining.

In an attempt to diminish the otherwise unfettered discretion that the city would have to set its law enforcement priorities without bargaining over them, the union posits that the designation of police officers as statutory "supervisors of attendance" requires them to perform duties that are not law enforcement functions.[4] The union misperceives the nature and purpose of that ostensible designation referenced in the special order. The special order lists the precise tasks that police officers are to undertake with respect to truants. Those specified tasks, not the complete duties of a "supervisor of attendance," are what the special order requires them to do. The city has disclaimed any

[4]The powers and duties of supervisors of attendance are specified in G. L. c. 76, § 20. Supervisors of attendance have responsibilities with respect to maintaining and analyzing records of school enrollment and attendance. G. L. c. 72, §§ 2, 8. They must "inquire into" cases involving discrimination in admission to public school (G. L. c. 76, § 5), tuition payments for nonresident children (G. L. c. 76, §§ 6-11), certificates of vaccination (G. L. c. 76, § 15), and unlawful child labor (G. L. c. 149, §§ 90, 92, 93, 95). If assigned by the court, they may also be called on to supervise a child placed on probation, or to supervise a child who has been granted a work permit. G. L. c. 76, § 20. G. L. c. 101, § 19. They may file petitions for children in need of services, G. L. c. 119, § 39E, and they may bring complaints for unlawful admission of unaccompanied children to places of entertainment, G. L. c. 140, § 197. The panoply of duties assigned to supervisors of attendance involve many that are far removed from the law enforcement duties of police officers.

misinterpretation of the special order that would confer such duties on them.[5]

We look therefore to the substance of what the special order now requires police officers to do. That special order requires them to take certain specific steps to enforce the laws pertaining to school attendance — make inquiry of the youth pertaining to the youth's status as a truant, confirm that status through inquiry to the dispatcher, and, if the youth is in fact truant and is willing, transport the truant to the appropriate center or office. These are steps that police officers previously took, in their discretion, when they came upon truants. The city's decision that such steps should be taken in all cases of suspected truancy is the product of the city's unfettered discretion to decide how its law enforcement resources are to be used to address what it perceives to be an appropriate law enforcement priority. The commission correctly determined that this was a decision concerning "where to deploy public services" that came "within the penumbra of managerial rights" that was not subject to mandatory bargaining under G. L. c. 150E, § 6.

---

[5]Indeed, in context, the designation of the officers as "supervisors of attendance" was made solely so that the officers would have the power to take a truant youth into custody. See G. L. c. 76, § 20 (supervisor of attendance "may apprehend and take to school without a warrant any truant or absentee found wandering in the streets or public places"). Even that power was apparently conferred on police officers solely as a precaution against claims of unlawful arrest — the special order makes clear that officers are *not* to detain or transport a truant youth without the youth's cooperation and consent, unless they have some other basis for arresting or stopping the youth and therefore do not need authority to "apprehend" truants "without a warrant" in order to carry out the duties specified in the special order. See G. L. c. 76, § 20. No term of the officers' employment has been changed by this precautionary and essentially meaningless designation.

The designation of the officers as "supervisors of attendance" is also ineffective. The union correctly points out that supervisors of attendance are appointed by a school committee, G. L. c. 76, § 19, and the city manager's purported designation of police officers as "supervisors of attendance" would therefore be invalid. The city essentially concedes the point, acknowledging that the designation "may have been in error." However, the special order does not designate the officers as "supervisors of attendance" — it merely references the city manager's purported designation — but instead orders the officers to perform certain specific steps when encountering truants during the course of regular patrol work. The city manager's improper designation of the officers is of no consequence to the operative requirements of the special order.

Notwithstanding a public employer's prerogative to make certain types of core managerial decisions without prior bargaining, we have recognized that such decisions may also have impacts or effects that would themselves be the subject of mandatory bargaining. "[I]f a managerial decision has impact upon or affects a mandatory topic of bargaining, negotiation over the impact is required." *Boston* v. *Boston Police Patrolmen's Ass'n*, 403 Mass. 680, 685 (1989). For example, while a public employer may decide to reduce the size of some component of its work force, the implementation of that decision — whether reduction will be accomplished by layoffs or by some other means, on what basis employees will be selected for involuntary layoff, and the timing and terms of such layoffs — affects "wages, hours, standards or productivity and performance, and any other terms and conditions of employment" over which public employers must bargain. G. L. c. 150E, § 6. See *School Comm. of Newton* v. *Labor Relations Comm'n*, 388 Mass. 557, 562-564 (1983). See also *Burlington* v. *Labor Relations Comm'n*, 390 Mass. 157, 164-167 (1983) (town had prerogative to reassign duties formerly held by police prosecutors to town counsel, but was required to bargain over impact where transfer had effect of loss of bonus pay detail and cost two officers loss of pay). Cf. *West Bridgewater Police Ass'n* v. *Labor Relations Comm'n*, 18 Mass. App. Ct. 550, 554 (1984) (town's change in procedures ceasing to require presence of arresting officers at arraignment did not require impact bargaining where only loss was of irregular and unscheduled overtime pay, which was not "term" of employment and "did not impinge directly on wages").

Here, the commission determined that the city was required to bargain over the impacts of the decision reflected in the special order. Before the Appeals Court, the city argued that that aspect of the commission's order was inconsistent with prior commission precedent. The city has not argued the point before us, and we treat the argument as waived. We therefore do not need to consider whether the impacts demonstrated here would be sufficient to trigger mandatory impact bargaining.

The decision and order of the Labor Relations Commission are affirmed.

*So ordered.*