NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1399

ESSEX NORTH SHORE AGRICULTURAL AND TECHNICAL SCHOOL DISTRICT

vs.

COMMONWEALTH EMPLOYMENT RELATIONS BOARD & another.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, Essex North Shore Agricultural and Technical School District (District), appeals from a decision by the defendant, the Commonwealth Employment Relations Board (CERB), concluding that the District violated G. L. c. 150E, § 10 (a) (1) and (5), when, without providing the intervener, AFSCME, Council 93, Local 245 (union), with an opportunity to bargain to resolution or impasse, the District changed bargaining unit members' summer work schedules and required that they use their accrued vacation, personal time, or unpaid leave

_____

[1] The American Federation of State, County, and Municipal Employees (AFSCME), Council 93, Local 245, intervener.

to supplement their weekly pay during shortened summer work weeks.  We affirm.

Background.  We recite the relevant facts as found by CERB and, where relevant, based on the parties' undisputed exhibits.

The District and the union were parties to a collective bargaining agreement (CBA) that detailed the terms and conditions of employment for a bargaining unit that included "all rank and file clerical, maintenance, custodians, cafeteria, and technical support employees."  Article 5 of the CBA concerns "hours of work," and states that the District "retains the right to determine employees' daily schedules" as well as "the right to alter the work year . . . with reasonable notice."

During the 2017, 2018, and 2019 summers, the District closed its buildings on Fridays and negotiated a memorandum of understanding (MOU) with the union each year concerning summer hours.  Those MOUs allowed employees to work four ten-hour days during the summers, with the 2019 MOU allowing employees to choose to work the four ten-hour days or to work four eight-hour days and use a vacation day each Friday.

In March of 2020, the District shut down various operations that impacted its budget due to the onset of the COVID-19 pandemic.  On May 2, 2020, the District's superintendent sent an e-mail to the union president to update the union about the status of the budget.  The superintendent told the union

2

president that the District would be determining "necessary cuts," which "may impact staffing." After further communication, on May 21, 2020, the District sent the union a copy of a draft budget as well as copies of proposed plans, which included possible furloughs, hiring freezes, position reductions, and other reductions.

On May 27, 2020, the union president replied to the superintendent and notified her that the union had questions about the budget and the proposed plans. On June 3, 2020, the superintendent and the union president spoke again, a conversation memorialized by the union president's follow-up e-mail the next day. The union president stated that she understood that any summer furlough would be done in a manner that would "not affect any people who will retire in the next three years and that those affected will be able to collect unemployment." The union president also stated that she anticipated an MOU from the District's attorney.

On June 7, 2020, the superintendent responded and, for the first time, raised the possibility of employees using vacation or personal time on Fridays during the summer. The superintendent also emphasized that the budget had not yet been approved and could still be impacted by uncertainty surrounding the overall State budget.

On June 13, 2020, the superintendent sent an e-mail to the union president stating that the District had decided not to implement the summer staff furloughs but instead would be proposing a reduced summer work schedule. She stated that the plan would require employees to work their normal hours, Monday through Thursday, and take Friday as a vacation, personal, or unpaid day, and that the District would work with new employees who did not yet have earned time.

On June 15, 2020, another union representative, the north shore coordinator, requested via e-mail a meeting with the superintendent. That meeting occurred by videoconference on June 18, 2020. At the meeting, the District set forth its plan as outlined in the June 13 e-mail. The District also proposed that employees could borrow time not yet earned to avoid pay reductions over the summer. The union rejected the District's plan and instead proposed that employees work four ten-hour days, Mondays through Thursdays, as they had in previous years, without having to utilize any paid leave benefits.

On June 22, 2020, the union representative informed the District's attorney that the union would need an MOU. The representative also noted that the union needed a thirty-day notice for the proposed schedule change and that the District could not instruct members to use their accrued benefit time.

4

On June 23, 2020, the District's attorney responded by e-mail, attaching a draft MOU, which contained the following:

> "Effective June 26, 2020 and continuing until August 14, 2020, District offices and operations will be closed on Fridays. Employees with available vacation or personal leave time will be required to use leave on those days or take them unpaid."

That same day, the union representative responded by e-mail to the District's attorney. She stated that the union was not in agreement with the word "required" and that the District "cannot require someone to use their time." The union representative also noted that the start date of June 26, 2020, did not conform with the CBA's requirement that the union be given thirty days' notice of a change in bargaining unit members' schedules. She requested that the District's attorney telephone her for more discussion.

At 10:28 P.M., the District's attorney responded by e-mail saying that his day had been "too packed," but he could call her the next morning to discuss the matter. Notably, the District's attorney stated in his e-mail:

> "I thought we discussed all of this stuff and decided it needed to be in an [MOU] . . . . The District has been incredibly generous in its approach to this crisis when other employers have been doing layoffs. Asking folks to use some vacation time during a low activity period after they have been able to stay home on full pay . . . does not seem unreasonable. Holding the Superintendent's feet to the fire in the middle of a pandemic over notice of a schedule that is a variation on a well-known summer schedule, seems unreasonable.

"People have a choice if they don't want to use their accrued leave -- they can take the time unpaid. The Superintendent said she would work with folks who don't have leave time to come up with a solution."

The next day, on June 24, 2020, the District's attorney did not telephone the union's representative. At 4:21 P.M., the union representative sent an e-mail to the District's attorney and told him that she had expected a telephone call from him. She also wrote, "the Union does not anticipate any changes in hours until we complete [our] impact bargaining and are able to ratify" the MOU. The District's attorney responded within the hour, stating that he had anticipated her letting him know when she was available for a telephone call prior to his calling her and that the District was willing to postpone the Friday closure to July 10 to comport with the notice requirement. He ended his e-mail with, "Other than that please let me know if the MOU is ok."

On June 29, 2020, the union filed a charge of prohibited practice with the Department of Labor Relations (DLR); in it, the union alleged that the District violated G. L. c. 150E, § 10 (a) (1) and (5), by unilaterally changing the summer work schedule for bargaining unit members on June 23, 2020.

On June 30, 2020, the superintendent sent to the union a memorandum, which announced schedule changes that would be effective July 13, 2020, until August 21, 2020. The memorandum

6

stated that employees (other than facilities, farms, and grounds employees) would work from 7 A.M. to 3:30 P.M. Monday through Thursday, and that -- as in previous years -- District buildings would be closed on Fridays.  During this time, employees "may" use personal or vacation time for the Friday closures.  On July 1, however, the superintendent sent an updated version of the memorandum stating that, during the relevant period, employees "will" use personal or vacation time for Fridays.  From July 13, 2020, through approximately August 21, 2020, the District's offices were closed on Fridays and employees used paid time off or took unpaid leave on those Fridays.  The parties had no further discussions about this issue.

On December 8, 2020, a DLR investigator issued a complaint of prohibited practice, alleging that the District had violated the law by (1) modifying bargaining unit members' summer work schedules without bargaining to impasse or resolution with the union and (2) by failing to meet with the union to continue bargaining over the changes in summer work hours and the use of paid time off.  In answer, the District raised affirmative defenses of waiver by contract, impasse, and economic exigency. After a hearing, the DLR hearing officer issued a decision finding that the District had violated the law as alleged in the complaint.  The District appealed to CERB, which affirmed the DLR's findings.

Discussion. 1. Standard. We review CERB's decision in accordance with G. L. c. 30A, § 14 (7). "A final administrative agency decision will be set aside if, among other grounds, it is [u]nsupported by substantial evidence, or [a]rbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law" (quotations and citations omitted). Commonwealth v. Commonwealth Employment Relations Bd., 101 Mass. App. Ct. 616, 622 (2022). "A commission's decision must be based on substantial evidence, i.e., such evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" North Attleboro v. Labor Relations Comm'n, 56 Mass. App. Ct. 635, 638 (2002), quoting G. L. c. 30A, § 1 (6). "The reviewing court 'must accord deference to the [board's] specialized knowledge and expertise, and to its interpretation of the applicable statutory provisions.'" Commonwealth Employment Relations Bd., supra at 623, quoting Worcester v. Labor Relations Comm'n, 438 Mass. 177, 180 (2002).

2. Failure to bargain to impasse. "[A] public employer violates G. L. c. 150E when it unilaterally changes an existing condition of employment or implements a new condition of employment concerning a mandatory subject of bargaining without first providing the union with notice and an opportunity to bargain to resolution or impasse." Newton v. Commonwealth Employment Relations Bd., 100 Mass. App. Ct. 574, 579 (2021).

8

That the District unilaterally altered an existing practice is undisputed.  The change to the affected staff members' summer schedules affected a mandatory subject of bargaining.[2]  The District argues that it provided both notice and an opportunity to bargain to resolution but had arrived at an impasse.  While the District did participate in some bargaining, CERB found that the District had "artificially shortened [the bargaining process] by presenting its plan as a fait accompli after only one meeting and a few days of bargaining via a flurry of emails."  The District claims that the union's refusal to change its position constituted an impasse.[3]

---

[2] One of the District's affirmative defenses raised before CERB, and pressed again on appeal, was that the District was entitled to modify the summer schedule with reasonable notice as per the plain language of the CBA, specifically Article 5, which allows the District to modify work schedules or the work year. We are unpersuaded.  As CERB found, the summer schedule change here is "a distinctly different proposition than changing the daily hours of full-time employees to meet the needs of the District as it had done in prior summers."  Although the decision to close the District's buildings on Fridays may constitute a level of services decision under the CBA, the means and methods of implementing that decision were bargainable.  See School Comm. of Newton v. Labor Relations Comm'n, 388 Mass. 557, 562-563 (1983).  Indeed, the parties had previously negotiated different means of implementing the District's decision to close on Fridays in past summers.

[3] The District alternatively argues, as it did below, that because the union did not offer counterproposals after the June 24 e-mail, it waived its right to bargain by inaction.  CERB found that there was no inaction, and this finding was supported by substantial evidence.  See School Comm. of Newton, 388 Mass. App. Ct. at 570 (waiver by inaction where party, after notice of change and opportunity to negotiate, "unreasonably or

9

"The existence of impasse is a question of fact," entitled to substantial deference. School Comm. of Newton v. Labor Relations Comm'n, 388 Mass. 557, 574 (1983). Here, CERB's finding that no impasse occurred is supported by substantial evidence. After engaging in some discussion, the District did not participate in any further bargaining when the union representative clearly indicated her desire to do so in her e-mails to -- and requests for a telephone call from -- the District's attorney.

Notably, the District never communicated that it believed that the parties had reached an impasse or otherwise fulfilled its obligation to facilitate actual bargaining. See Secretary of Admin. & Fin. v. Commonwealth Employment Relations Bd., 74 Mass. App. Ct. 91, 98 (2009) (if "impasse was in sight as the implementation deadline approached, . . . the Commonwealth could have imposed a reasonable negotiation deadline, implemented the [MOU], and continued post-implementation bargaining"). Finally, the District's own position appeared to be inconsistent even

---

inexplicably failed to bargain or to request bargaining").
Indeed, the union representative's earlier e-mails provided
substantive objections and requested to continue bargaining.
Instead of addressing the requests to keep bargaining, the
District's attorney asked if the "incredibly generous" MOU --
with which the union had already stated it was not in agreement
-- was "ok" after admonishing the union representative for
"[h]olding the Superintendent's feet to the fire in the middle
of a pandemic."

after the e-mails between the union representative and the District's attorney, as is evidenced by the July 1 change in the June 30 memorandum sent by the superintendent to the union, at which time the language governing the work hours was changed from staff "may" use to "will" use personal or vacation time for the Friday closures.

All of this demonstrates that the parties did not exhaust the possibility of a compromise.  "There can be no impasse justifying unilateral action if the cause of the deadlock is the failure of one of the parties to bargain in good faith."  School Comm. of Newton, 388 Mass. at 574.

Decision and order of the
  Commonwealth Employment
  Relations Board affirmed.

By the Court (Grant,
  Brennan & Toone, JJ.[4]),

Clerk

Entered:  May 2, 2025.

---

[4] The panelists are listed in order of seniority.