Chief Justice for Administration and Management *v.* Commonwealth Employment Relations Board.

## Chief Justice for Administration and Management of the Trial Court *vs.* Commonwealth Employment Relations Board.

No. 09-P-1574.

Suffolk. April 14, 2010. - April 28, 2011.

Present: Katzmann, Meade, & Sikora, JJ.

*Chief Justice for Administration and Management. Trial Court,* Court officers. *Public Employment,* Collective bargaining. *Labor,* Collective bargaining. *Contract,* Collective bargaining contract. *Commonwealth,* Collective bargaining. *Commonwealth Employment Relations Board.*

Discussion of the standard of review applicable to a decision of the Commonwealth Employment Relations Board. [380]

Discussion of the public policy limitation on collective bargaining [380-382] and the authority of the Chief Justice for Administration and Management of the Trial Court over the employment of Trial Court personnel [382-383].

The Commonwealth Employment Relations Board (board) erred in ruling that the assignment by the Chief Justice for Administration and Management of the Trial Court (CJAM) of nonunion per diem retired court officers to certain court sessions comprised a mandatory bargainable term or condition of employment requiring negotiation about its impact before the assignment, where the applicable collective bargaining agreement made no reference to the use of per diem retirees, the Justices of the Supreme Judicial Court and the Legislature bestowed authority on the CJAM to assume exclusive authority for the hiring, deployment, and management of court officers, and the gravity of the public interests at stake in court room security rendered the subject a nonbargainable power and duty of the government [383-386]; further, no evidence supported the board's conclusion that the CJAM bore a statutory duty of preliminary negotiation about the consequences or impacts of the assignment of per diem retirees upon union members and their union [386-387].

APPEAL from a decision of the Commonwealth Employment Relations Board.

*Anne-Marie Ofori-Acquaah* for the plaintiff.

*Maydad D. Cohen* for the defendant.

SIKORA, J. This appeal presents the question whether the Chief

Justice for Administration and Management of the Trial Court (CJAM) must collectively bargain over the impact of his decisions to hire and deploy court officers for public safety purposes. The Commonwealth Employment Relations Board (board) ruled that the CJAM's unilateral decision to hire nonunion per diem court officers for service in the Superior Court in Suffolk County, without negotiation with the relevant court officers' union of the consequences of that action, constituted a prohibited labor practice. The board ordered that the CJAM engage in remedial bargaining and "[m]ake whole affected employees for any [resulting] loss of wages and benefits." For the following reasons, we reverse the decision and order of the board.

The material facts are undisputed. The CJAM and the Suffolk County Superior Court Officers Association (SCSCOA) submitted agreed exhibits and stipulated information to the board.[1] Neither side has challenged any element of the board's resulting findings. We summarize the material facts.

*Background. 1. Court officers' duties.* The essential duties of court officers in all departments of the Trial Court include, but are not limited to, the provision of security for the public, jurors, parties, witnesses, attorneys, judges, court personnel, and prisoners, in the courtroom and in other designated areas of the courthouse; maintenance of order and response to disruptive events in the courtroom; custody, care, escort, and documentation of prisoners within the courthouse; confinement or release of defendants at the direction of the court; location and direction of trial participants; and the communication of information of court procedures to the public, litigants, witnesses, attorneys, jurors, and citizens summoned for jury service. In accordance with G. L. c. 211B, § 9A, all court officers of the departments of the Trial Court are employees of the CJAM.

The public employee labor relations statute, G. L. c. 150E, § 3, as amended by St. 1978, c. 478, § 76, at all relevant times

---

[1]Since the beginning of litigation in June of 2003, the National Association of Governmental Employees (NAGE) has succeeded SCSCOA as the bargaining representative of the employees. All material events occurred during the period of SCSCOA's representation.

NAGE has not joined the appeal as successor in interest of SCSCOA. The appellate parties are the CJAM and the board.

authorized three bargaining units for court officers: one for court officers in the Superior Court in Suffolk County ("Suffolk Superior Court" or "Suffolk"); one for the officers in the Superior Court in Middlesex County ("Middlesex Superior Court" or "Middlesex"); and one for all remaining court officers of the Trial Court throughout the Commonwealth (the general unit). In 1978, the Labor Relations Commission[2] certified SCSCOA as the exclusive collective bargaining unit for the Suffolk officers and the two respective separate units for the Middlesex officers and the remaining Statewide officers.

The CJAM's director of security has overseen the assignment of officers throughout the Trial Court. The assignment process has traditionally accommodated the felt needs of the system. If a particular court lacked an officer or more by reason of illness, disability, or vacation, the director has reassigned officers from other courts or departments to fill the absence even if the absent officer was a member of a separate bargaining unit. In addition, the CJAM assigned certain officers to work for extended periods in courts in which members of their respective bargaining units did not regularly work. As of the end of December, 2001, ten members of SCSCOA and eight members of the Middlesex Superior Court officers' bargaining unit had worked for years in courts served by members of the general bargaining unit; and for a number of years four members of the general unit had worked in the Middlesex Superior Court.

2. *Retirement incentive legislation.* As we shall discuss below, in 1992, the Supreme Judicial Court had authorized the CJAM to hire and deploy officers to combat a security crisis in the Trial Court. In response to a fiscal crisis, the Legislature on December 29, 2001, enacted an early retirement incentive program for CJAM employees. St. 2001, c. 218. To qualify for an expanded retirement allowance, employees had to submit applications between January 2 and January 23, 2002, for retirement effective no later than February 1, 2002. St. 2001, c. 218, §§ 2, 3. Nine SCSCOA officers submitted applications.

The sudden loss of officers in Suffolk Superior Court created

---

[2]Now known as the Division of Labor Relations. See St. 2007, c. 145, § 8. The board is the body within the Division of Labor Relations charged with deciding adjudicatory matters. See G. L. c. 23, § 9R; G. L. c. 150E, § 11.

a dangerous shortfall. On January 31, 2002, counsel for SC-SCOA efficiently summarized it in the following passages of a letter to the CJAM's director of security:

> "As you are aware, this office represents the Suffolk County Superior Court Officers Association. As you also know, over the past several years the number of court officers in the Suffolk Superior Court has been reduced significantly. Even so, as of 1999 there were 55 court officers in the Suffolk Superior Court. Since that time, through attrition, the number has been reduced to 47.

> "Now, as a result of the early retirement incentive there will be a reduction of an additional 9 employees effective Monday, February 4, 2002. This will leave only 38 court officers to cover all the judicial sessions of the Suffolk Superior Court. This is extremely inadequate and will create an unsafe environment. With this small number of court officers the existing court officers will not be able to provide the level of security that is expected and needed by the public.

> "The Union is of course extremely concerned about the depletion in its numbers and the potential of creating a truly unsafe environment at the courthouse. In the wake of the need for additional security after the events of September 11, 2001, it will be impossible to provide the needed level of security with only 38 court officers.

> "The Union therefore demands that the 6 [*sic*] Suffolk County Superior Court officers who are currently assigned to courts outside the Suffolk County Superior Court be immediately returned to work at the Suffolk Superior Court. In addition, other action must be taken to quickly replace the court officers who are leaving. This is a crisis and it must be addressed without delay.

> "We appreciate your immediate attention to this matter."

The CJAM and the union worked out several measures to address the staffing shortage. In April of 2002, the president of SCSCOA and the CJAM's directors of security and of human resources agreed that the seven SCSCOA members still

temporarily assigned to other court locations would return to their permanent positions at Suffolk Superior Court. Those officers did return to Suffolk, but over the ensuing four or five months four of them informed the SCSCOA president of their desire to return to their alternate court locations. During the fall of 2002 or early winter of 2003, the union proposed to the CJAM an arrangement in which those four would return to the prior locations and four members of the general bargaining unit would replace them in Suffolk. In March of 2003, that accommodation went into effect.

Budgetary constraints frustrated the CJAM's intention to hire additional officers in January of 2003. Instead, as authorized by G. L. c. 32, § 91(*b*), he planned to employ a limited number of retired court officers on a per diem basis to relieve the shortage of officers throughout the Trial Court.[3] SCSCOA objected to that plan upon the ground that its collective bargaining agreement (covering the period of July 1, 2000, through June 30, 2003) contained no reference to the use of retirees. The union proposed that regular SCSCOA officers perform extra duties until the budget enabled additional full-time hires; or that the CJAM transfer officers from the general bargaining unit to Suffolk and replace those transferees with per diem retirees.[4] The resulting discussion proved inconclusive.

In or about March, 2003, the CJAM employed retirees to work in trial courts covered by the general bargaining unit and, for the first time, in Suffolk Superior Court. As of mid-April,

---

[3]As of January, 2003, that statute in pertinent part provided that

"any person who has been retired and who is receiving a pension or retirement allowance . . . from the commonwealth . . . may, subject to all laws, rules and regulations . . . be employed in the service of the commonwealth . . . for not more than nine hundred and sixty hours in the aggregate, in any calendar year; provided that the earnings therefrom when added to any pension or retirement allowance he is receiving do not exceed the salary that is being paid for the position from which he was retired . . . ."

G. L. c. 32, § 91(*b*), as amended through St. 1994, c. 367, § 1.

[4]The SCSCOA president was aware that the CJAM had previously hired per diem retirees to work in Trial Court sessions outside Suffolk County, and particularly at locations on Cape Cod and the Islands. The 2000-2003 collective bargaining agreement between CJAM and the general bargaining unit anticipated the use of per diem court officers.

three retirees were engaged in the Suffolk sessions at the rate of one to three days per week. They were performing the same functions as full-time SCSCOA members.

3. *Board proceedings.* In June, 2003, SCSCOA filed charges with the board's predecessor Labor Relations Commission (see note 2, *supra*). The union alleged specifically that the CJAM had committed a prohibited practice in violation of G. L. c. 150E, § 10(*a*)(1) and (5),[5] by the decisions, made without impact bargaining, (1) to hire nonbargaining unit personnel to work as court officers, and (2) to transfer bargaining unit work to those personnel (the retirees).

By a decision in January of 2009, the board reasoned that the existent collective bargaining agreement between the CJAM and SCSCOA contained no reference to the use of per diem workers; that their employment "had an impact on SCSCOA bargaining unit members' terms and conditions of employment, by, among other things, causing them to lose the opportunity to work extra hours to complete the tasks performed by the per diem court officers"; that the use of the retirees constituted the prohibited transfer of bargaining unit work to nonunit personnel so that, even if that measure did not inflict any reduction in SCSCOA positions, it nonetheless "constitute[d] a detriment to the bargaining unit because it [could] result in an eventual elimination of the bargaining unit through gradual erosion of bargaining unit duties." The board regarded the CJAM's "unilateral action" as a prohibited "[r]efus[al] to bargain collectively in good faith with the exclusive representative" of the affected employees, within the meaning of G. L. c. 150E, § 10(*a*)(5),

---

[5]General Laws c. 150E, § 10, inserted by St. 1973, c. 1078, § 2, includes the following:

"(*a*) It shall be a prohibited practice for a public employer or its designated representative to:

"(1) Interfere, restrain, or coerce any employee in the exercise of any right guaranteed under this chapter;

". . .

"(5) Refuse to bargain collectively in good faith with the exclusive representative [of protected employees] as required in [§ 6, regarding terms and conditions of employment]."

and thereby as an interference with or restraint upon "any employee in the exercise of any [statutory] right" within the meaning of § 10(*a*)(1). By remedial orders, it directed the CJAM to bargain over the impacts of the employment of the retirees upon the terms and conditions of the regular officers and to compensate any affected regular officers for loss of wages and benefits.

In accordance with G. L. c. 150E, § 11(*i*), the CJAM has timely sought judicial review of the board's decision and order by this court.

*Analysis.* 1. *Standard of review.* Section 11(*i*), as appearing in St. 2007, c. 145, § 7, directs us "insofar as applicable" to conduct review under the standards of the Administrative Procedure Act, G. L. c. 30A, § 14. Consequently we examine the entire administrative record with appropriate deference to the board's "specialized knowledge and expertise, and to its interpretation of the applicable statutory provisions." *Worcester* v. *Labor Relations Commn.*, 438 Mass. 177, 180 (2002). As always, however, deference does not permit abdication of judicial supervision. See, e.g., *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgmt. Bd.*, 421 Mass. 196, 211 (1995). And interpretation of a statutory scheme remains ultimately a matter of law for the court. See *Onex Communications Corp.* v. *Commissioner of Rev.*, 457 Mass. 419, 424 (2010). In this instance we must determine whether the board's decision constitutes (1) an error of law within the meaning of G. L. c. 30A, § 14(7)(*c*), because it violates public policy, see, e.g., *Secretary of Admn. & Fin.* v. *Labor Relations Commn.*, 434 Mass. 340, 342-343, 345 (2001); (2) action arbitrary, capricious, or abusive of discretion within the meaning of G. L. c. 30A, § 14(7)(*g*); or (3) a determination unsupported by substantial evidence within the meaning of G. L. c. 30A, § 14(7)(*e*).

2. *The public policy limitation upon collective bargaining.* The right of Massachusetts public employees to collective bargaining of the wages, hours, standards of productivity and performance, and other terms and conditions of their employment constitutes a "strong public policy" for the achievement of fair working arrangements and the orderly provision of societal services. *School Comm. of Pittsfield* v. *United Educators of*

*Pittsfield*, 438 Mass. 753, 761-762 (2003). See G. L. c. 150E, §§ 2 (right to organize), 5 (powers and duties of the bargaining unit), and 6 (right to negotiate).

At the same time, the public interest can impose a necessary limitation upon the collective bargaining process. The governmental employer is not free to bargain away certain elements of its nondelegable authority and responsibility to act for the public health, safety, and welfare. "While this principle may be raised in varied contexts — in unfair labor practice proceedings . . . in actions to stay arbitration . . . or . . . in actions to vacate or confirm arbitral awards — the analysis to be utilized is essentially the same in all instances: whether the ingredient of public policy in the issue subject to dispute is so comparatively heavy that collective bargaining, and even voluntary arbitration, on the subject is, *as a matter of law*, to be denied effect" (emphasis supplied) (footnotes omitted). *School Comm. of Boston* v. *Boston Teachers Union, Local 66*, 378 Mass. 65, 70-71 (1979).

One purpose of the principle is the retention of public policy making in the hands of governmental employers accountable directly or indirectly through "the normal political process," and the prevention of the devolution of policy making to the narrower perspective and accountability of interest group bargaining. *Id.* at 71 & n.13.[6]

The characterization of a subject as a collectively bargainable term and condition of employment, on the one hand, or as a non-negotiable subject of exclusive managerial prerogative, on the other, can be difficult because many decisions of the public employer include both a managerial function and an effect upon the terms and conditions of the employees' work. The character

---

[6]See Summers, Public Employee Bargaining: A Political Perspective, 83 Yale L.J. 1156, 1193 (1974):

"In the public sector, . . . government is establishing structures and procedures for making its own decisions. In the private sector the parties may agree at the bargaining table to expand the subjects of bargaining, but a public employee union and a public official do not have the same freedom to agree that certain decisions should be removed from the ordinary political processes and be decided by them in a special forum. The private employer's prerogatives are his to share as he sees fit, but the citizen's right to participate in governmental decisions cannot be bargained away by any public official."

of a disputed subject or "ingredient" can depend upon the inherent or traditional nature of the function (e.g., hiring and supervision are managerial, wages and hours are bargainable), its possible constitutional nature, or the legislative terms of its delegation. These criteria can define the "dominant" character of a disputed subject as bargainable or nondelegable. See *Chief Justice for Admn. & Mgmt. of the Trial Ct.* v. *Office & Professional Employees Intl. Union, Local 6,* 441 Mass. 620, 628-629 (2004) (inferring from a blend of statutory provisions the CJAM's exclusive managerial prerogative over assignment and temporary transfer of court reporters and its compatibility with certain collective bargaining terms); *Somerville* v. *Somerville Mun. Employees Assn.,* 451 Mass. 493, 497-500 (2008) (clear and specific statutory conferral of appointment authority upon mayors excluded it from collective bargaining). See generally *Board of Educ. of the Woodstown-Pilesgrove Regional Sch. Dist.* v. *Woodstown-Pilesgrove Regional Educ. Assn.,* 81 N.J. 582, 588-591 (1980) (comprehensive discussion).

3. *Authority of CJAM.* Multiple sources of law invest the CJAM with broad authority over the employment of Trial Court personnel. General Laws c. 211B, § 9A, provides, "All court officers appointed at any time . . . to any department of the trial court shall be employees of the chief justice for administration and management who shall have the authority to appoint, dismiss, define the duties of, assign, transfer and discipline said court officers within the trial court departments as he deems necessary for the administration of justice and for *public safety*" (emphasis supplied).[7]

In September of 1992, the Justices of the Supreme Judicial Court enlarged upon that authority. In response to a growing concern about security in the buildings of the Trial Court, the Justices issued an "Order Relative to the Safety and Security of the Facilities of the Trial Court." Its relevant language included the following paragraphs.

---

[7]The Legislature inserted § 9A by St. 1992, c. 379, § 78. It thereby expands upon the authority of the CJAM under G. L. c. 211B, § 9(xxii) — an authority existing in some form since St. 1978, c. 478, § 110 — to transfer nonjudicial employees "to serve where needed" for up to one year and within reasonable distance of prior duty "when necessary to ensure the proper administration of justice." St. 1992, c. 379, § 77.

79 Mass. App. Ct. 374 (2011) 383

Chief Justice for Administration and Management *v.* Commonwealth Employment Relations Board.

"WHEREAS, the Justices of the Supreme Judicial Court have determined that the security crisis described by the Chief Administrative Justice [now the CJAM] endangers the safety and security of Trial Court judges and employees and members of the public who use Trial Court facilities, and substantially interferes with the judicial branch's ability to fulfill its constitutional duty to administer the laws of the Commonwealth of Massachusetts and of the United States of America:

"The Justices of the Supreme Judicial Court, pursuant to their constitutional, statutory, and inherent powers of general superintendence of all the courts of the Commonwealth, including the specific provisions of G. L. c. 211B, § 9, HEREBY DECLARE a state-wide security emergency in the courts of the Commonwealth and HEREBY ORDER that [the] Chief Administrative Justice . . . immediately assume exclusive authority for the hiring, deployment, and management of all court officers in the Trial Court. This order shall remain in effect until further notice. . . ."

The order has remained in force to the present.

Additionally, article XVI of the 2000-2003 collective bargaining agreement between the CJAM and SCSCOA identified certain "[m]anagement [r]ights . . . vested exclusively in the Employer." These included "the contracting out, or the discontinuation of services, positions or programs in whole or in part; . . . assignment, direction and transfer of personnel; . . . [and] whatever actions may be deemed necessary to carry out [the CJAM's] responsibilities in situations of emergency." Article XXI of the agreement reiterated the CJAM's right to "contract[] out" for services deemed necessary.

4. *The character of the CJAM's decisions.* The board concluded that the assignment of the three retirees to the Suffolk Superior Court sessions comprised a mandatory bargainable term or condition of employment requiring negotiation about its impact before the assignment. For several reasons that position is untenable.

Preliminarily we observe that this case does not present the collision of a collective bargaining term favorable to the union

with a statutory authorization favorable to the employer. The 2000-2003 agreement between the CJAM and SCSCOA makes no reference to the use of per diem retirees.[8]

Rather, the board reasoned that the general duty of bargaining prescribed by G. L. c. 150E, §§ 2, 5, and 6, overrode the specific delegations of G. L. c. 211B, § 9A, the Supreme Judicial Court's ongoing 1992 order, and articles XVI and XXI of the 2000-2003 collective bargaining agreement.[9] The strength, specificity, and sources of those authorizations defeat that rationalization. The Justices of the Supreme Judicial Court acted "pursuant to their constitutional, statutory, and inherent powers of general superintendence of all courts of the Commonwealth." By G. L. c. 211B, § 9A, the Legislature confirmed the power to assign and transfer court officers as the CJAM "deems necessary for the administration of justice *and for public safety*" (emphasis supplied).[10] In apparent recognition of such authority and

---

[8]Therefore we do not need to resort to the "conflicts" itemization of G. L. c. 150E, § 7(*d*), specifying the primacy of a contractual term against certain contrary statutory provisions. We note, however, that, even if SCSCOA did have the benefit of a contractual term forbidding or limiting the use of retirees, that term would not override the authority conferred upon the CJAM to assign personnel for the purpose of "public safety" under G. L. c. 211B, § 9A. The "conflicts" section does *not* include that provision among the subordinated statutes. "[S]tatutes not specifically enumerated in § 7(*d*) will prevail over contrary terms in collective bargaining agreements." *Chief Justice for Admn. & Mgmt. of the Trial Ct.* v. *Office & Professional Employees Intl. Union, Local 6*, 441 Mass. at 625, quoting from *Commonwealth* v. *Labor Relations Commn.*, 404 Mass. 124, 126 (1989).

[9]In the preliminary phase of its decision, the board referred to each of the three sources, but then omitted them entirely from its analysis of the application of the collective bargaining provisions of G. L. c. 150E, § 10(*a*)(1) and (5).

[10]The 1992 enactment of § 9A articulated the purposes of "the administration of justice" and "public safety" as underlying the authority of assignment and transfer of court officers. The earlier provision of G. L. c. 211B, § 9, as appearing in St. 1978, c. 478, § 110, without specifying a purpose, enabled the CJAM to transfer nonjudicial employees within limitations of reasonable distance. See note 7, *supra.* In *Chief Justice for Admn. & Mgmt. of the Trial Ct.* v. *Office & Professional Employees Intl. Union, Local 6*, 441 Mass. at 630 n.17, the court referred to the authority of § 9(xxii), then existing since 1992 and specifying the purpose of the proper administration of justice, as the "critically important management prerogative of deciding which courts are understaffed and which have available resources that could be used to staff them," and observed that the CJAM had not relinquished that power in the pertinent collective bargaining agreement. The broader language of § 9A

responsibility, the 2000-2003 agreement acknowledged the CJAM's discretion to assign and transfer personnel, and even to "contract[] out" necessary services. The first two delegations came with particularity from the constitutional bodies answerable directly or indirectly through proper political process for the public interest. See *School Comm. of Boston* v. *Boston Teachers Union, Local 66*, 378 Mass. at 71. The third one came from the collective bargaining negotiators themselves.

Finally, the comparative weight or dominant character of the public interest at stake is compelling. That interest is the security and safety of the trial courtroom. Obviously, the courtroom serves as the venue and symbol of the administration of justice. The fulfillment of the most fundamental constitutional powers, duties, rights, and policies relies upon its security. A brief and obvious catalogue must include the general entitlement of the citizenry to legal rights and recourse, art. 11 of the Massachusetts Declaration of Rights; the right to jury trial in civil cases, art. 15; the right to a fair and impartial judiciary, art. 29; the aggregate criminal procedural rights to present evidence, to confront adverse witnesses, to receive effective assistance of counsel, to be judged by an impartial jury of peers, to receive a trial speedy and public, to remain silent, and to be free of excessive bail, fines, and cruel and unusual punishment, arts. 12 and 26, and the Fifth, Sixth, and Eighth Amendments to the United States Constitution applied through the due process clause of the Fourteenth Amendment; and the right of the public and the press to be present at the civil and criminal proceedings in the courtroom implied from the First and Fourteenth Amendments. See *Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555, 575-580 (1980); *Globe Newspaper Co.* v. *Superior Ct.*, 457 U.S. 596, 604-606 (1982). To these we might add the sense of security trusted by the citizens coming forward as witnesses and jurors. Finally, the essential courtroom functionaries, including the session clerks, reporters, and court officers themselves, must have a safe workplace. The gravity of these interests renders the

encompassing the purposes of *both* "the administration of justice" and "public safety" without limitations of procedure or duration necessarily conveys authority even deeper than a "critically important management prerogative," authority of an inalienable, nonbargainable character.

subject of courtroom security a nonbargainable power and duty of the government.[11] The board's contrary order violates public policy and constitutes an error of law within the meaning of G. L. c. 30A, § 14(7)(*c*).

5. *Impact bargaining.* The board contends that, even if the substance of the decision to employ the retirees were not bargainable, the CJAM bore a statutory duty of preliminary negotiation about the consequences or impacts of their assignment upon SCSCOA members and the SCSCOA unit. In *Chief Justice for Admn. & Mgmt. of the Trial Ct.* v. *Office & Professional Employees Intl. Union, Local 6*, 441 Mass. at 629, the court noted that the CJAM could, by collective bargaining, bind himself to a preliminary or ancillary process "precedent to the making of [a nondelegable] decision" to transfer court reporters. *Ibid.*, quoting from *School Comm. of Danvers* v. *Tyman*, 372 Mass. 106, 113 (1977). The freedom to assume such ancillary requirements for assignment decisions over nonjudical personnel for general administrative purposes under G. L. c. 211B, § 9(xxii), does not logically or practically extend to assignment decisions delegated by the Supreme Judicial Court and the Legislature specifically for maintenance of public safety in the courtroom. The more urgent nature of the second purpose need not await the delay or complications of prior negotiations. The CJAM is entitled and required to act swiftly and flexibly to assure courtroom safety.[12]

Nor do the circumstances of this case support a claim for

---

[11]In its brief in this court, the board has not recognized the distinctive character of the courtroom:

> "That the workplace at issue is a courtroom rather than a factory floor is beside the point, given that the Legislature through Chapter 150E requires collective bargaining for the Commonwealth's courthouses."

[12]For example, multiple criminal sessions hosting trials of high publicity, tension, numerous witnesses, emotional spectators, and lengthy duration can challenge or tax the resources of the Trial Court, especially in times of manpower shortage. The CJAM requires the freedom to deploy court officers to the points of need without delay and without burdensome consequences at later moments when his needs may be equally serious. The immediate availability of retirees provides assistance to less urgent sessions and frees up regular officers for the more demanding ones.

Here, the board appears to assume that retirees were displacing regular offi-

subsequent or postdecision bargaining. The board's findings of impacts receive no support from the record. It conceded "that no bargaining unit members lost work as a result" of the use of retirees, but nonetheless concluded that SCSCOA members "lost the opportunity to perform the bargaining unit work performed by the per diems" and that the transfer of bargaining unit work to nonunit personnel could set in motion "an eventual elimination of the bargaining unit through gradual erosion of bargaining unit duties."

No evidence, let alone substantial evidence, supports those determinations. The record indicates that employment and assignment of retirees on the prescribed part-time scale resulted from a shortage of necessary full-time officers and not from the transfer of any work from available regulars to invading per diems. If the retirees had not performed their work, it would have gone undone. The board cannot simultaneously find that "no bargaining unit members lost work" performed by the per diems and order that the CJAM "[m]ake whole affected employees for any loss of wages and benefits suffered as a result of the CJAM's unlawful actions." Nor does any evidence support its notion that the use of the three retirees began a process of "erosion" and "eventual elimination" of the regular court officers' union by loss of work and membership displacement.[13]

In short, the board cannot conjure up hypothetical detriments as a justification for purposeless impact bargaining. Its determination upon this subject lacks the support of substantial evidence within the meaning of G. L. c. 30A, § 14(7)(*e*), and constitutes arbitrary and capricious action within the meaning of G. L. c. 30A, § 14(7)(*g*).

---

cers in their main function: presence in the courtroom. No evidence supports that assumption. The record supports the inference that the regulars were working at maximum levels and that the retirees were supplemental, not substitutional.

[13]Any alleged loss of work or unit erosion in Suffolk Superior Court would result at least in part from the conduct of SCSCOA members. When the unit called upon the CJAM for help in January of 2002 (by counsel's letter), the CJAM brought the seven detached court officers back to the county in the spring. Then, when four of them preferred to return to their out-of-county locations, the SCSCOA president and the CJAM arranged as an accommodation to replace them with four members of the general bargaining unit.

*Conclusion.* The determination of proper security for the Commonwealth's trial courtrooms is not a collectively bargainable subject. The Supreme Judicial Court and the Legislature have committed it to the nondelegable authority of the CJAM. The CJAM does not bear a duty to engage in collective impact bargaining before the employment and assignment of court officers for security purposes. We express no view whether courthouse security decisions are categorically exempt from all subsequent impact bargaining. The circumstances of this case revealed no impacts warranting such bargaining.

*Decision and order of the Commonwealth Employment Relations Board reversed.*