This case arises out of the decision of an arbitrator rendered in a grievance arbitration between the Plaintiff, City of Boston (the "City"), and the Defendant, Boston Firefighters' Association, International Association of Fire Fighters Local 718 (the"Union"). The parties conducted this arbitration before a mutually sel ted neutral (the "Arbitrator"),in accordance with the terms of their collective bargaining agreement (the"CBA" or the "contract"). The proceeding resulted in a grievance-sustaining decision in favor of the Union, which ordered the City to cease and· desist denying vacation-related overtime opportunities to eligible employees of the Construction Shop arid Radio Shop units of the Boston Fire Department, and to make whole any bargaining unit employees who were denied such opportunities on or after May 9, 2023 (the "Award").
            Presented for decision are the City's Motion to Vacate the Arbitration Award and the Union's Cross-Motion to Confirm the Arbitrator's Award. The City contends that the Award infringes upon the nondelegable, managerial prerogatives of the City's Fire Commissioner, and
 
                                                            -1-
 
thereby exceeds the statutory authority conferred upon bitrators pursuant toG.L. c. 150C, §· 1l(a)(3). The Union opposes this motion, and seeks confirmation of the award in accordance with G.L. c. 150C, § l l(d). Forthereasons\"hich follow, the City's Motion to Vac te shall be
ALLOWED and the Union's Motion to Affirm shall be DENIED.
BACKGROUND[1]
            I. THE CBA AND THE COMMISSIONER'S DIRECTIVE
            The City and the Union are parties to a CBA that was in effect at all times relevant to this matter. Pursuant t·o the CBA, the Boston Fire Department ("BFD") employs a 24-hour shift schedule fo line firefighters and other personnel.[2] (Pl.'s Ex. A, the Award, at 3; Pl.'s Ex.B,the CBA, Art. VII, § 1.) Expressly excluded from the 24-shift schedule are members of the Fire Alarm Division Construction Force, which includes the Radio Shop and Construction Shop units. (Ex. A, at 3; Ex. B, Art. VII, § 1.) Together, these two units are responsible for maintaining the BFD's communication infrastructure, including fire alarm call boxes, radios on fire apparatus, dispatch systems, and support for the 9-1-1 system. For these units, the CBA prescribes a 40- hour workweek, consistµig of either five consecutive, eight-hour daysor four consecutive, ten- hour days. (Ex. B, Art. VII, § 6.) The Radio Shop is comprised of one supervisor, one operator, and three radio repairmen. Members of this unit typically work Monday through Friday, maintaining the portable radios utilized by BFD personnel. The Construction Shop consists of a general foreman, with approximately twelve subsidiary foremen and workers under his supervision. Members of the Construction Shop unit generally work four-day rotating schedules
 
--------------------------------------------
 
[1] This section is drawn from the parties' joint exhibits submitted at arbitration and from the facts found by the Arbitrator, which are binding on the Court. See Dracut v. Dracut Firefighters Union, IAFF Loc. 2586, 97 Mass. App. Ct.374, 375 (2020).
[2] This shift schedule consists of a 10-hour day tour, followed by a 14-hour night tour. Firefighters and fire alarm operators work one 24-hour shift on, followed by two 48-hour shifts off, then one shift on, followed by four shifts (96 hours) off.
 
                                                            -2-
 
that may include weekends. These employees maintain and repair alarm boxes; underground cables, and telephone poles using "cherry pickers" and cable trucks. The Arbitrator characterized the work of the Radio and Construction Shop as critical to the BFD's overall operations, but not emergent, as indicated by their exclusion from the CBA's round-the-clock schedule.
            Article XIX, § 9C of the CBA sets forth the terms governing the assignment of overtime shifts to personnel who "fill-in" for firefighters and "equivalent ranks" who are absent for vacation or personal leave. Specifically, this contract provision stat s:
"Effective January 1, 2015, the Fire Department's overtime obligation hereunder is to provide each employee holding the rank of Firefighter or its equivalent with the opportunity during each calendar year to work four (4) overtime tours of duty, two (2) day tours and two (2) night tours, when other Firefighters are on vacation . . . Overtime shall be allocated within each company and unit pursuant to rotation of a roster established in each company and unit by departmental seniority.
Each tour of Firefighter or equivalent rank vacation leave absence shall be filled in accordance with this contractual provision until all. - employees in the rank ofFire:fighter or its equivalent have been  given the opportunity to serve the specified number of overtime tours during each calendar year pursuant to the roster rotation system and the right of refusal provisions specified herein....
The foregoing shall be applicable to incumbents of the Firefighter equivalent rank in the Fire Alann Division and to all other Firefighter equivalent ranks in the Fire Department yvithln the context of absences caused by vacation leave.
The Local 718 President and the Fire Commissioner, or their respective designees, periodically shall review the operation of the foregoing allocation of overtime opportunities to ensure that each employee in the rank of Firefighter or its equivalent receives his/her opportunity to serve the annual overtime tour as provided herein."
(Ex. A, at 5-6; Ex. B, Art. XIX, § 9C.) Appendix D to the CBA provides for twelve, "rank-for- rank" overtime tours per year for "Fire Captains and Fire Lieutenants . . . and the equivalent
 
                                                            -3-
 
ranks of the Fire Alann Division (Senior and Principal Operators, etc.)" in the event a corresponding officer is absent for vacation or personal leave.[3] (See Ex. A, at 7; Ex. B, Appendix D.) Lastly, the CBA provides for a dispute resolution process culminating in final and binding arbitration of all unresolved grievances, except that an arbitrator "shall make no decision which alters, amends, adds to or detracts from this Agreement, . . . or which modifies or abridges the rights or prerogatives of municipal management . . . " (Ex.. A, at Ex. 4; Ex. B, A. Art. XVI,§ 5.)
            By statute enacted in 1895, the B'  FD operates "under the charge of the Fire Commissioner, who ... shall appoint a Chief of Department, Assistant Chiefs, Deputy Chiefs, District Chiefs and other Officers and fire fighters,' Boston Mun. Code§ 11-4.1, citing St. 1895 c. 449 §§ 9-11. The Fire Commissioner is charged with exercising all powers and duties conferred upon his position by statute or city ordinance to extinguish fires and protect life and property in Boston in the event of fire. See St. 1895, c. 449, §§ 9-10.
            From 2015 until May 2023, members of the BFD's Radio and Construction Shop units were permitted, without restriction, to earn overtime by covering  e   shift of a colleague who was out on vacation. .On May 9, 2023, however, the Fire Commissioner, Paul F. Burke, issued a · department wide directive that suspended minimum staffing for  the Radio and Construction Shop units and ordered that future overtime work by members of these units would be subject to prior approval by Deputy Fire Chief James Hoar. Violations of this directive would be subject to discipline. Commissioner Burke testified before the Arbitrator that he issued this directive after a departmental review revealed that Radio and Construction Shop personnel were approving their own overtime, and thereby collecting significantly more in premium compensation than firefighters in the field-some as much as $60,000 to $70,000 annually. Commissioner Burke
 
--------------------------------------------
 
[3] From 2015 to 2020, the CBA provided for eight rank-to-rank, vacation overtime tours for these Company Officers: The number of tours was increased to twelve in 2021.
 
                                                            -4-
 
testified that this practice diverged from and disserved the intent of the CBA, and exceeded the operational needs of the  BFD.  More specifically,  Commissioner  Burke explained  that the rules for vacation fill-in overtime set forth in the CBA are intended to support the 24-hour operational needs of emergency field personnel, and not those of administrative or support units such as the Radio and Construction Shops.
            After Commissioner Burke issued his May, 2023 directive, no overtime opportunities - fill-in vacation or otherwise - were approved for members of the Radio Shop or Construction Shop for the remainder of that year. The Union's President, Sam Dillon, testified at arbitration that Commissioner Burke's directive effectively denied future overtime opportunities to members of these two units.
            II.        PROCEDURAL HISTORY
            On July 31, 2023, e Union filed an unfair labor practice charge with the Massachusetts Department of Labor Relations (DLR), alleging that the BFD's change to the Radio and Construction Shop units' vacation coverage and overtime policies was improper because it was subject to mandatory bargaining. Following an investigation, the DLR .dismissed this charge on January 25, 2024, concluding that the matter was not subject to mandatory bargaining. (See Ex. G.)
            Four days later, the Union filed a class grievance, challenging the Commissioner's directive as a violation of the CBA. The grievance proceeded without resolution through the multi-step process set forth in the contract and, on May 15 , 2024, the Union file a demand for arbitration. An evidentiary hearing was held before the mutually-selected Arbitrator on November 19, 2024.
            At the arbitration, the Union argued that bargaining unit employees in the Radio and
 
                                                            -5-
 
Construction Shops are entitled to the overtime opportunities guaranteed by the CBA, inasmuch as the Shop units' line workers and supervisors are, respectively, the "equivalent ranks" of firefighters under Art. XIX.§ 9C and"Company Officers" under Appendix D. Toe Union further contended that the Radio and Construction Shop units had been treated in such fashion since 2015. Thus, according to the Union, the Commissioner's directive violated both the terms of the CBA and established past practice. The City responded that the directive was a necessary administrative decision that aligned with the BFD's operational priorities and fiscal responsibility and, consistent with the parties' original intent, the CBA overtime provisions did not apply to the Radio and Construction Shop units but instead only to those employees working a 24-hour shift schedule.[4] The City further argued that the interpretation of the contract urged by the Union would unlawfully interfere with the Commissioner's core, nondelegable managerial authority over staffing and operational decisions within the BFD.
            In a decision issued on April 23, 2025, the Arbitrator concluded that the City / Commissioner had violated with CBA by "unilaterally suspend[ing] the opportunity for bargaining unit members in the ( ) Construction and Radio Shop units to work overtime tours to cover vacation absences." (Ex. A, at 1.) Addressing himself to whether the Radio and Construction Shop units were entitled to the overtime guarantees of§  9C and Appendix D, the Arbitrator concluded that the term "equivalent ranks" is ambiguous. In this connection, the Arbitrator noted that the Radio and Construction Shop units are not expressly excluded from the overtime guarantees of§ 9C or Appendix D, as they are from the 24-hour set schedule set forth in Art. VII, § 1. Furthermore, while Appendix D identifies "Senior and Principal [Alarm] Operators" as an example of "equivalent ranks" of Company Officers, inclusion of the term
 
--------------------------------------------
 
[4] The City contended that the term "Fire Alarm Division" in Art. XIX, § 9C refers to Fire Alarm Operators who, like line firefighters, work 24-hour rotating shifts and hold civil service ranks.
 
                                                            -6-
 
"etc." thereafter suggests that the list is not exhaustive. The Arbitrator additionally found that the pay structures of the Radio and Construction Shop units mirror those of the other divisions of the BFD. However, in contrast to other BFD personnel, bargaining unit employees of the Radio and Construction Shops do not hold civil service ranks, do not take promotional exams, and do not perform emergency response functions under the contract's 24-hour shift schedule. Finally, the Arbitrator made note of the dearth of evidence as to the parties' intent at the time the CBA's overtime provisions were agreed to and implemented in 2015.[5]
            Faced with this conflicting record, the Arbitrator concluded that the parties' past practice- viz.,affording members of the Radio and Construction Shop units unrestricted overtime opportunities for vacation-related absences from 2015 to 2023 and over multiple contract cycles -was determinative. (See id. at 23 ("A past practice that is consistent, long-standing, and mutually accepted may become binding and serve to clarify ambiguous language.")).
            The Arbitrator rejected the City's argument that invalidating the overtime directive would infringe on the Commissioner's statutory managerial rights, concluding that:
"[M]anagement authority does not extend to altering or nullifying bargained-for benefits without negotiation. The Massachusetts courts have consistently held that managerial prerogatives, while broad, cannot override express contractual obligations. In this case, the directive went beyond routine staffing adjustments and substantively changed the application of an agreed-upon benefit without bargaining, in violation of the CBA."
Id. at 23-24.) The Arbitrator thus ordered the City "to cease and desist from denying vacation related overtime opportunities to eligible employees in the [ ] Construction and Radio Shop units, consistent with past practice, and to make whole any affected employees who were denied such opportunities from May 9, 2023 through the date of this award." (Id at 24.)
 
--------------------------------------------
 
[5] Such evidence might typically consist of statements made in written proposals exchanged at the bargaining table, or in recorded minutes of bargaining sessions.
 
                                                            -7-
 
            This action followed.
DISCUSSION
            I. STANDARD OF REVIEW
            "The system of collective bargaining created and indorsed by the Legislature necessitates deference to the bargained-for result of an arbitrator's award." Pittsfield v. Local 447 Int'l Bhd. of Police Officers, 480 Mass. 634, 637 ( 018). As the Supreme Judicial Court (SJC) has repeatedly made clear:
"We ... uphold an arbitrator's decision even when it is wrong on the facts or the law, and whether it is wise or foolish, clear or ambiguous. Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Where the arbitrator allegedly engaged in improvident, even silly, fact finding, we are nonetheless bound by those facts. An award cannot·be disturbed even if an arbitrator's findings are so confusing or unclear that, in order to evaluate the merits of an award, we would have to confront conflicting inferences."
Id. at 638 (citations and quotations omitted). In short, an arbitral award "carries a presumption of propriety because it is the arbitrator's judgment, not necessarily an objectively correct answer, for which the parties have bargained." Id.
            "Because the public policy of the Commonwealth strongly encourages both collective bargaining and arbitration ... a court may vacate arbitration awards only in rare, statutorily enumerated circumstances."Dracut v. Dracut Firefighters Union. IAFF Loc. 2586, 97 Mass. App. Ct. 374, 377 (2020) (internal quotations omitted), citing G.L. c. IS0E, §§ 6. 11. Accord
Boston v. Boston Police Patrolmen's Ass'n, 443 Mass. 813, 818 (2005). One such ground is where ''the arbitrator[] exceeded [his] powers or rendered an award requiring a person to commit an act or  engage in conduct prohibited by state or federal law." G.L.c. 150C, §1l(a)(3). See
 
                                                            -8-
 
Department of State  Police v.  Massachusetts  Org.  of  State Eng'rs & Scientists, 456  Mass. 450, 455 (2010) ("[A]n agreement to arbitrate a dispute which lawfully cannot be the subject of arbitration [i]s equivalent to the absence of a controversy covered by the provision for arbitration."). Under the nondelegability doctrine, a court may vacate an arbitration  award  where the "arbitrator intrudes upon decisions ... left by statute to the exclusive managerial control of designated public officials." Dracut, 97 Mass. App. Ct. at 377 (alteration in original), quoting Boston v. Boston Police Patrolmen's Ass'n. 477 Mass. 434,440 (2017).[6]
            Here, the City argues that the Arbitrator's Award directing the City to provide members of the Radio and Construction Shop units with vacation-related overtime opportunities intrudes upon the Fire Commissioner's nondelegable authority. The Court agrees.
II.        THE NONDELEGABILITY DOCTRINE
            "G[eneral] L[aws] c. 150E provides a comprehensive framework for the regulation of public sector collective bargaining ... and imposes significant obligations on public employers with respect to those rights." Board of Higher Educ. v. Commonwealth Emp. Reis, Bd., 483 Mass. 310, 311 (2019). Public employers must "negotiate in good faith with respect to wages, hours, standards of productivity and performance, and any other terms and conditions of employment." G.L. c. 150E, § 6.
            The SJC has, however, "long recognized the tension between" the obligations G.L. c. 150E imposes on public employers and ''the Legislature's intent to bestow upon those employers nondelegable managerial responsibilities." Board of Higher Educ., 483 Mass. at 310. By its terms, G.L. c. 105E, § 6 is "capable of a construction so broad as to encompass almost any
 
--------------------------------------------
 
[6] Whether raised in unfair labor practice proceedings, an action to stay arbitration, or an action to vacate or confirm an arbitral award, the nondelegation analysis "is essentially the same in all instances[.]" Chief Just. for Admin. & Mgmt. of Trial Court v. Commonwealth Emp. Reis. Bd. 79 Mass. App. Ct. 374,381(2011).
 
                                                            -9-
 
matter arising between the public sector employer and the employees;" but such an expansive reading would cut "[a]gainst the general, long-recognized principle that a discretionary power committed to a public officer by statute may not be delegated to another[.]" Lynn v. Labor Rels. Comm'n. 43 Mass. App. Ct. 172, 177-78 (1997). Thus, despite an acknowledged public policy favoring collective bargaining and arbitration, see School Comm. of Pittsfield v. United Educators of Pittsfield, 438 Mass. 753. 758 (2003). the SJC has held that certain subjects must be reserved to the exclusive discretion of the public employer. See Worcester v. Labor Relations Comm'n, 438 Mass. 177, 181 (2002).[7]
"[F]rom th[e] expansively defined category of mandatory bargaining subjects, [our courts] have exempted certain types of managerial decisions that must, as a matter of policy, be reserved to the public employer's discretion. [I]n instances where a negotiation requirement would unduly impinge on a public employer's freedom to perform its public functions. G.L. c. 150E, § 6, does not mandate bargaining over a decision directly affecting the·employment relationship."
Dracut. 97 Mass. App. Ct at 378-79, quoting Worcester, 438 Mass. at 180.
            A core purpose of this nondelegability doctrine is to ensure that public policymaking remains "in the hands of governmental employers accountable directly or indirectly through 'the normal political process,'" and prevent such policymaking from devolving "to the narrower perspective and accountability of interest group bargaining." Chief Just. for Admin. & Mgmt. of Trial Court v. Commonwealth Emp. Rels. Bd., 79 Mass. App. Ct. 374,381 (2011), quoting School Comm. of Boston v. Boston Tchrs. Union, Local 66. 378 Mass. 65. 71 & n.13 (1979).
 
--------------------------------------------
 
[7] Accord Department of State Police v. State Police Ass'n of Mass., No. 2384-CV-02184-H, 2024 WL 5344635, at *2 (Mass. Super. Ct. Dec. 19, 2024) (Ullman, J.) ("[T]he Supreme Judicial Court has not hesitated to hold that a statutory provision removes certain employer/employee disputes from the collective bargaining agreement."); Malden Police Patrolmen's Ass'n v. Malden, No. MICV201304428, 2013 WL 5988412, at  *3 (Mass. Super. Ct. Oct. 21, 2013) (Wilson, J.) ("Not every decision by a public employer that has some effect on public employees" is subject to mandatory bargaining under G.L. c. 150E, § 6).
 
                                                            -10-
 
The tension reflected in the nondelegability doctrine is particularly acute ''in the context of public safety, most notably policing[,]" where, as is the case here, "[s]tatutes ... defining the authority of police and fire chiefs, respectively, were adopted long before the enactment of G.L. c. lS0E[.]" Dracut, 97 Mass. App. Ct. at 378. Thus, as the SJC recently recognized, public officials charged with administering police and fire departments "are not free to bargain away certain elements of their nondelegable authority and responsibility to act for the public health, safety, and welfare, because the public interest ... impose[s] a necessary limitation upon the collective bargaining process." Boston Firefighters Union, Loc. 718, lnt'l Ass'n of Fire Fighters, AFL-CIO v. Boston, 491 Mass. 556,566 (2023) (holding City's COVID-19 vaccination requirement for fire and police forces was a nondelegable policy decision). "In sum, the nondelegability doctrine is a judicially created doctrine limiting the reach of G.L. c. 150E,.§§ 6- 7, in those circumstances where public policy requires that a public employer reserve certain personnel matters to its sole discretion in order to preserve accountability to the public in the performance of the essential functions of government." Dracut, 97 Mass. App. Ct. at 379.
            "A public employer need not defend the wisdom of a policy choice that it has made in order to have that choice recognized as a core [nondelegable] managerial prerogative. It is the fact that the public employer's choice is one of policy, not the merits of the choice the employer makes, that renders the choice an inappropriate subject of mandatory bargaining." Boston Firefighters Union, 491 Mass. at 565, quoting Worcester, 438 Mass. at 183. Expounding this aspiration of the nondelegability doctrine, the SJC has stated:
"The inquiry [is] directed towards defining the boundary between subjects that by statute, by tradition, or by common sense must be reserved to the sole discretion of the public employer so as to preserve the intended role of the governmental agency and its accountability in the political process..The crucial factor in determining whether a given issue is a mandatory subject of
 
                                                            -11-
 
bargaining is whether resolution of the issue at the bargaining table is deemed to conflict with perceived requirements of public policy."
Id. at 181 (quotations omitted).
            The scope of a public employer's nondelegable authority "depends on the explicitness of the statutory authorization under which [that] employer acts." Board of Higher Educ., 483 Mass. at 319 (quotation omitted). Where, as here, the enabling statute defines that authority in broad, general terms, ''the scope of exclusive management powers has been worked out on a case-by- case basis."M,. (quotations omitted). Thus, the nondelegability doctrine lends itself to f(?W bright line rules. Whether a subject is "so fundamental to the effective operation of an enterprise as to be exempt from mandatory bargaining requirements [] necess[arily] var[ies] with the nature of the employer[.]" Worcester, 438 Mass at 181, quoting Local 346. Int'l Bhd. of Police Officers v. Labor Relations Comm' n, 391 Mass. 429, 439-40 (1984). The dividing line can be difficult to draw,"because many decisions of the public employer include both a managerial function and an effect upon the terms and conditions of the employees' work." Chief Just., 79 Mass. App. Ct. at 381. See also Lynn, 43 Mass. App. Ct. at 177 (noting that the relevant precedent "is not always easy to reconcile," and that "[a]ny attempt[ ] to define with precision and certainty the subjects . about which bargaining is mandated by [c.] 150E is doomed to failure"). The Court must, therefore, construe the "dominant" character of the disputed subject as either bargainable or nondelegable, based· upon ''the inherent and traditional nature of the function (e.g., hiring and supervision are managerial, wages and hours are bargainable), its possible constitutional nature;
or the legislative terms of its delegation." Chief Just., 79 Mass. App. Ct. at 382. These formidable challenges recognized, our courts' decisions applying the nondelegability doctrine provide guidance.
 
                                                            -12-
 
            Traditionally, a public employer's decisions regarding staffing and assignments, e.g.;the level of services a public entity provides, the workforce necessary to do so, the  distribution of duties to that workforce, and the  manner and  priority  with which those duties  are performed, have constituted nondelegable, managerial prerogatives that cannot be subject to collective bargaining. See Local 2071. Int'l Ass'n of Firefighters v. Bellingham, 67 Mass. App: Ct. 502, 510 (2006), aff'd, 450Mass. 1011 (2007) ("A union cannot ... determine the level of government services" or compel an employer to assign additional personnel), citing School Comm. of Newton v. Labor Relations Comm'n 388 Mass. 557,563 (1983). For example, our courts have long held the decisions regarding the deployment of law enforcement are reserved for the sole discretion of the police chief/ public employer. See, Worcester, 438 Mass. at 181-82 (directive that officers prioritize truancy enforcement nondelegable; allocation of resources "among competing law enforcement priorities" was "purely a matter of policy" that "must be reserved to the sole discretion of the public employer" [internal quotation omitted]); Boston v. Boston Police Superior Officers Fed'n. 466 Mass. 210, 214-15 (2013) (decisions to transfer officers between precincts nondelegable); Boston v. Boston Police Patrolmen's Ass'n, 403 Mass. 680, 684 (1989) (commissioner's decision to assign one officer, not two, to each marked cruiser nondelegable}; Burlington v. Labor Relations Comm'n. 390 Mass. 157, 164 (1983) (decision to assign prosecutorial duties to town counsel and not to police prosecutors was "exclusive managerial prerogative, and not a proper subject for collective bargaining"); Framingham v. Framingham Police Officers Union. 93 Mass. App. Ct. 537, 543 (2018) (transfer of officer from detective bureau to patrol nondelegable). As the Appeals Court has explained, "'the Legislature, by enacting G.L. c. 150E ... did not intend ... to deprive the chief of his authority to exercise his own discretion and judgment as to the number, qualifications and
 
                                                            -13-
 
identity of officers needed for particular situations at any given time." Taunton v. Taunton Branch of Mass. Police Ass'n, 10 Mass. App. Ct. 237,243 (1980). "The demands of public safety and a disciplined police force underscore the importance of management control over matters such as staffing levels, assignments, uniforms, weapons, and definition of duties," and "to the extent [these] subjects . . . find their way into a collective bargaining agreement, th[ose]
provisions ... are not enforceable." Boston v. Boston Police Superior Officers Fed'n, 29 Mass. App. Ct. 907, 908 (1990).
            Of particular relevance to the case at bar, courts have construed the nondelegable discretion of a public safety employer as extending to the authority to decide duty, vacation, and leave assignments, Chief of Police of Dracut v. Dracut, 357 Mass. 492,502 (1970) (town could not bargain away police chiefs authority over such matters), and to compel personnel to work overtime. See, st.&, Saugus v. Saugus Pub. Safety Dispatchers Union, 65 Mass. App. Ct. 901, 901-02 (2005) (order that civilian dispatchers work compulsory overtime held nondelegable management prerogative); Saugus v. Saugus Police Superior Officers Union, 64 Mass. App. Ct. 916, 916-17 (2005) (same as applied to superior officers); Andover v. Andover Police Patrolmen's Union, 45 Mass. App. Ct. 167, 169-70 (1998) (same as aookied to line officers; police chief had nondelegable discretion to order "mandatory overtime deployment when, in his judgment, the public safety so requires"); Boston v. Boston Police Patrolmen's Ass'n, 41 M s. App. Ct. 269,272 (1996) (line officers); Colonel & Superintendent of Mass. State Police v. State Police Assoc. of Mass., 72 Mass. App. Ct. 1111, 2008 WL 2985245, at *2-5 (Aug. 6, 2008) (Rule 1:28 decision) (decision to assign overtime duties to lieutenants that had traditionally been performed by union troopers found nondelegable); Department of State Police v. State Police Ass'n of Mass., No. 2384-CV-02184-H, 2024 WL 5344635, at *2 (Mass. Super. Ct. Dec. 19,
 
                                                            -14-
 
7024) (Ullman, J.) (order that uniformed troopers work July 4 holiday nondelegable).
            To be sure, and consistent with the required case-by-case analysis, our appellate courts have noted on occasion that the reasoning applied to the management of police departments “may not necessarily apply to ... other municipal departments." Dracut, 97 Mass. App. Ct. at 381 n.11, quoting Chief of Police of Dracut, 357 Mass. at 502. While no Massachusetts court has to date addressed whether the contours of the nondelegability doctrine map onto fire departments in the same manner they do police departments, the Appeals Court has recognized that the two public safety agencies are, at a minimum, analogous to one another. Dracut, 97 Mass. App. Ct. at 377, 381-82. Furthermore, it bears noting that a public employer's nondelegable discretion to determine staffing and assign duties has not been limited to law enforcement agencies. See, School Comm. of Natick v. Education Ass'n of Natick, 423 Mass. 34, 41 (1996) (decision not to reappoint athletic coach nondelegable); School Comm_. of Newton. 388 Mass. at 563 (decision to reduce janitorial services nondelegable); Boston Tchrs. Union, -Loc. 66 v. School Comm. of Boston, 386 Mass. 197, 212 (1982) ("[A]bility to determine the appropriate size of the teaching staff in light of available funds" held nondelegable as "[e]ssential to the management of the public schools"); Board of Higher Educ./Holyoke Cmty. Coll. v. Massachusetts Tchrs.' Ass'n./Mass. Cmty. Coll. Council, 79 Mass. App. Ct. 27, 32-34(2011) (college's judgment as to best qualified candidate deemed nondelegable); Massachusetts Dep't of Transp. v. United Steelworkers. Local, No. 2484-CV-01156, 2024 WL 5342508, at *4 (Mass. Super. Ct. Dec. 18, 2024) (Belezos, J-.) ("[S]taffing decisions taken in furtherance of efficient and effective operation of the command and control functions of the [Highway Operations Center] ... are nondelegable
 
                                                            -15-
 
powers").[8]
            With the foregoing decisional authorities as guideposts, the Court assesses to the issue presented- viz.,whether, in light of the specific facts found by the Arbitrator, the Commissioner's directive to suspend minimum staffing of the Radio and Construction Shops and to subject overtime therefor to prior management approval, effectively ending overtime opportunities for employees of those units, was arbitrable or fell within the Fire Commissioner's nondelegable authority. The Court acknowledges at the outset that issues concerning overtime live at the intersection of a public employer's nondelegable, managerial prerogatives and its statutory bargaining obligations -- implicating both staffing on the one hand, and wages on the other. But many decisions of public employers bear this very dual character, and managerial prerogatives do not become subject to bargaining merely because they have "an effect upon the terms and conditions of the employees' work." Chief Just., 79 Mass. App. Ct. at 381. The Court must instead consider the "dominant character" of the Commissioner's directive to determine on which side of the dichotomy the decision falls. Id. at 382 (emphasis added).
            The Commissioner's directive suspended minimum staffing for the Radio and Construction Shops, a subject which the Legislature has expressly recognized as an "inherent managerial policy" for which a public employer may not be compelled to bargain. See St. 1973, c. 1078, § 4A(3)(a), as amended through St. 1987, c. 589, § 1 ("[N]o municipal employer shall be required to negotiate over subjects of minimum manning of shift coverage, with an employee organization representing municipal police officers and firefighters.").The directive further
 
--------------------------------------------
 
[8] Additionally, as to the precedent holding that orders to perform mandatory overtime work were nondelegable, the Appeals Court has explained that such decisions do not turn on the so-called "strong [police] chief statute," but rather rest upon "the general managerial authority vested in police chiefs ... where matters of public safety are concerned." Saugus Pub. Safety Dispatchers Union, 65 Mass. App. Ct. at 901-02.
 
                                                            -16-
 
asserts the authority of BFD management to decide, in its unilateral discretion, whether to approve overtime work by Radio and Construction Shop employees as necessary, or whether such work may be effectively suspended or discontim,1ed. The directive is, therefore, at its core, a decision regarding the deployment of staff and the allocation of resources within a public safety agency, an exercise of authority Massachusetts courts have consistently held to be nondelegable. See ante. It is a judgment call of the Commissioner (exercised through the Deputy Chief) that, in light of the other public safety imperatives of the BFD, the work of the Radio and Construction Shops is not so emergent and time-sensitive as to justify the expense of overtime to complete it. It is thus akin to nondelegable staffing decisions to assign fewer officers to a patrol car, Boston, 403 Mass. at 6 4, to order a reduction in services and workforce, School Comm. of Newton. 388 Mass. at 563, or otherwise set the department's priorities, Worcester, 438 Mass. at 181-82, and to determine how many employees are "needed for particular situations at any given time." Taunton, 10 Mass. App. Ct. at 243.
            The Fire Commissioner is charged with exercising all of his legal powers to protect life and property in Boston in the event-of fire. See St. 1895, c. 449, §§ 9-10. How he allocates personnel and department resources in the performance of these essential functions must be subject to public accountability, rather than to the different and far narrower interests of
collective bargaining. Chief Just.. 79 Mass. App. Ct. at 381. At its most basic level, if a police chief possesses nondelegable discretion to compel civilian and uniformed employees to work overtime, See Saugus, 65 Mass. App. Ct. at 902, then it logically follows that the head of an analogous public safety agency (a fire department) possesses the nondelegable authority to
 
                                                            -17-
 
decide whether certain work duties require overtime at all.[9]
            The Union has not demonstrated, and the Count does not find, that any functional distinctions between police and fire departments compel a different conclusion here. While not evaluating merits of the decision,  the Court notes that the Commissioner's directive is entirely consistent with the Arbitrator's assessment of the work performed by the Radio and Construction units. Namely, their duties are neither emergent nor time-sensitive. The record thus reflects that the general practice of the Radio and Construction units with regard to unfinished work was for employees to pick up where they left off when they returned for the next regularly scheduled
workday or shift. (See Pl.'s Ex. G, DLR Decision, at 3.)
            To be sure, the Commissioner's directive has some detrimental impact on Radio and Construction Shop employees' overall compensation. Undoubtedly, the objective of these employees in performing overtime is to receive the corresponding, incentivized wages and, for them, such is the crux of the dispute. But that unadorned fact does not alter the essential substance or dominant character of the Commissioner's directive, any more than it would the myriad other nondelegable decisions that affect employee compensation but are, nonetheless, "[p]recluded from collective bargaining." Lynn, 43 Mass. App. Ct. at 179. These include such "broad categories as appropriations decisions, .. ·. decisions to abolish positions, [and] decisions to reduce budget outlays even when these decisions will result in reductions in force." Id. (citing cases). As the SJC has recognized, "mere characterization of a-feature of a collective bargain or an arbitration award as 'compensation,' .·.. , will not save the provision" where, in substance, the matter lies within the discretionary judgment reserved to the public employer. Id. at·176, quoting
 
--------------------------------------------
 
[9] There is no suggestion in the Arbitrator's findings (or anywhere in the record) that the inability of Radio or Construction Shop employees to work over time had or portended any direct or appreciable impact on employee safety or workloads.
 
                                                            -18-
 
Watertown Firefighters. Local 1347.1.A.F.F., AFL-CIO v. Watertown, 376 Mass. 706, 714 (1978) (internal quotation omitted).
            In the case at bar, the Commissioner did not alter the rate of overtime pay or direct that work previously designated for overtime or hazard pay be compensated at a non-premium hourly rate. The Commissioner's directive was, rather, fundamentally, a staffing decision -viz.,a determination of whether,·based on the BFD_'s mission and available resources, it is necessary when an employee of the Radio or Construction shop is absent on vacation to have a unit colleague cover his shift. The Commissioner and the Deputy Chief determined it was not. That decision cannot be meaningfully distinguished from other discretionary, nondelegable judgments of a public employer that certain work or jobs are not needed. See supra, School Comm. of Newton, 388 Mass. at 563. See also School Comm. of Hanover v. ,Curry 369 Mass. 683,683 (1976) (committee's unilateral decision to abolish position held nondelegable).[10]
 
--------------------------------------------
 
[10] As such, the instant case falls into the category of discretionary managerial decisions concerning, e.g.,the scope of services to provide or whether to fill or eliminate a position (decisions which cannot be delegated to collective bargaining), rather than a dispute over implementation that might be appropriate for so-called impact bargaining. See School Comm. of Newton. 388 Mass. at 563-64. "Impact bargaining," in this context, refers to the principle that a public employer who renders a nondelegable decision - e.g.,a reduction in force - may be required to bargain over the means of implementing that decision-e.g., by layoffs or otherwise. Id. According, 43 Mass. App. Ct. at 179.
            The case of Lakeville v. Local 3188, Int'! Assoc. of FireFighters. No. PLCV2006-0320.2007 WL 2677982 (Mass. Super. Ct. Mar. 2&, 2007) (McIntyre, J.), illustrates this distinction and reinforces the nondelegable nature of the Commissioner's directive. In Lakeville, an arbitrator concluded that the town fire chief violated the parties' collective bargaining agreement by using a "call'' firefighter to staff a temporary vacancy, rather than scheduling union firefighters to work overtime  in accordance with the collective bargaining agreement's preference provision. Id. at •1. Affirming the arbitrator's decision, the Court explicitly distinguished the fire chiefs discretionary- i.e., nondelegable - decision as to whether to fill the vacancy from his bargainable decision as to how to fill the vacancy:
"[T]he preference provision governs the procedure to follow after the chief decides, in his discretion, to fill a vacancy. The provision that a member of the collective bargaining unit have priority over call firefighters in performing collective bargaining work that the chief chooses to assign does not interfere with management decisions regarding whether the·work should be performed, the nature of the work to be performed, and which individual firefighter to assign to a particular task."
Id. at *12 (emphasis added). In contrast, the present case concerns a nondelegable policy judgment regarding whether the subject subject work should be performed. This is the  critical distinction acknowledged in Lakeville.
 
                                                            -19-
 
            In its zeal to recast the Commissioner's directive as a wage-related decision, the Union effectively gives the game away. The Union portrays Art. XIX, § 9C and Appendix D as effectively a guarantee of overtime pay-the equivalent of four shifts per year for each-Radio or Construction shop worker and twelve shifts for each Company Officer equivalent - regardless of whether the employees actually work those shifts. The Union goes so far as to argue that the Award does not infringe upon the Commissioner's nondelegable authority, or even his directive specifically, because the City can simply pay unit employees the equivalent of four or twelve overtime shifts, respectively, even if the Commissioner determines at the overtime coverage is not needed and the employees do not actually work the shifts. (See Pl.'s Opp. at 17, 20.) The Union further contends that paying these employees "overtime" wages where no overtime work is required or performed does not create a public safety issue, and thus does not implicate the public policy concerns animating the nondelegability doctrine. (Id.  at 20.) This is simply not true. The public's interest in the proper administration of the BFD is not limited to matters of safety, and the Union's argument flies in face of the City's and Commissioner's legal duties as stewards of the public fisc.
            The record in this case reflects that Radio and Construction Shop employees were earning as much as $60,000-$70,000 in overtime compensation, notwithstanding the non- emergent nature of their work. The Union now contends that the CBA may compel employer payment of su9h overtime wages, where the work is not merely non-urgent but not even needed or performed at all. It cannot be gainsaid that the public interest is not remotely served by permitting collective bargaining agreements to require costly premium compensation where overtime work is not in fact required, or where overtime shifts are not in fact worked. This simply cannot be the rationale by which the bar of the nondelegability doctrine is avoided in
 
                                                            -20-
 
the present case. "Collective bargaining cannot reach out to control by agreement subjects predominantly within the realm of [ ] management ... even when those subjects or the purported agreements about them have some relation to wages or employment or working conditions." Watertown Firefighters. Local 1347. 376 Mass. at 715 (internal quotation omitted). Whatever
. one thinks of the Union's imaginative work-around, the directive of the Commissioner in this case is indisputably a discretionary. managerial decision regarding whether to fill particular vacancies, whether the given work should be performed at all, and how best to deploy BFD employees and resources. In accordance with the precedents cited ante, such decisions are not a proper subject of mandatory bargaining or arbitration.
            Finally the fact that the Radio and Construction Shop employees were permitted to work vacation fill-in shifts from 2015 to 2023, without restriction, does not alter the outcome. While the parties' course of conduct may be relevant in discerning the meaning of ambiguous contract terms, the BFD's past practice of affording Radio and Construction Shop employees the opportunity to work unscheduled overtime does not take the subject matter outside of a public employer's nondelegable authority. See Worcester. 438 Mass. at 182 (holding past practice did not deprive public employer of its nondelegable authority to change its practice or priorities in assigning duties};.Lynn. 43 Mass. App. Ct. at 184 n.14 (1997) (noting past practice immaterial where decision was nondelegable). See also West Bridgewater Police Ass'n v. Lab. Reis. Comm'n, 18 Mass. App. Ct. 550 (1984) (recission of fifteen-year policy permitting overtime not subject to mandatory bargaining). The essence of nondelegable authority is that it does not erode over time. The animating principle of the doctrine - accountability to the public and political process - would be substantially undermined if one administration's practice, or mere indifference to a practice, could constrain or dilute its successors' discretion to enact future
 
                                                            -21-
 
public policy change.
CONCLUSION AND ORDER
            For the foregoing reasons, the Plaintiff City of Boston's Motion to Vacate the Arbitration Award is ALLOWED. The Defendant Union's Cross-Motion to Affirm the Arbitrator's Award is DENIED. The Arbitrator's Award is hereby VACATED, and judgment shall enter in favor of the Plaintiff.
SO ORDERED.
/s/Robert B. Gordon
Justice of the Superior Court
Dated:
@March 11, 2026